614 A.2d 590
**Robert Lester TRACEY**
v.
**Ruth Marie TRACEY.**
No. 156, Sept. Term, 1991.
Court of Appeals of Maryland.
Oct. 29, 1992.

J. Dennis Murphy, Jr. (Reed & Murphy, on brief), Annapolis, for petitioner.

Ruth Marie Tracey, Baltimore, pro se.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case involves an award of indefinite alimony and presents the primary question of whether, in computing the award, the trial court erred in disregarding a spouse's wages from a part-time job in addition to her income from regular, full-time work.

## I

Robert Lester Tracey and Ruth Marie Tracey sought to end their marriage of twenty-six years. On December 17, 1990, the Circuit Court for Anne Arundel County (Wolff, J.) granted the parties an absolute divorce based on a voluntary separation which had continued uninterrupted for more than the twelve months required by statute. Maryland Code (1984, 1991 Repl.Vol.) § 7–103(3) of the Family Law Article. The Traceys had previously agreed to an equal division of their marital assets, including the value of their home, life insurance policies, automobiles and other personal property, a mutual fund, and Robert's company savings plan.

The sole dispute as to financial matters concerned an alimony award to Ruth. The hearing before Judge Wolff revealed that Robert, then forty-eight years old, was a supervisor of technical training for the Baltimore Gas & Electric Company, where he had worked since 1960. In 1989 he earned, with overtime, $57,973.25 in wages. His

1990 income, including anticipated stock dividends, projected to roughly $61,000. The trial court fixed the husband's expenses at $2010 each month, relative to his net monthly income of $3360.

In 1989, Ruth, who was then forty-six years old, earned $15,381.88 as a full-time civilian payroll technician for the federal government; she had entered government service in 1987. The 1990 projected wages from this employment reached $16,849. Ruth supplemented her income with a part-time job at a McDonald's fast food restaurant, where she had begun working soon after the parties' final separation in the spring of 1989. She worked at the restaurant between twenty and twenty-five hours each week, earning $4.90 per hour. This part-time work brought in approximately $4,800 annually, thereby producing a total income for Ruth in 1990 of about $21,649.

Judge Wolff determined that Ruth's basic monthly expenses for food, shelter, clothing, transportation, medical care and other sundries approximated $1730. Her debt service obligations added some $385, resulting in total expenditures of about $2115 per month. The court established Ruth's net monthly income at roughly $1400; this figure represented her net government salary, projected interest income from her share of the marital assets other than the house, and a $200 contribution toward expenses from an adult son living with her.

The trial court awarded Ruth indefinite alimony of $300 per month. In making its calculations, the court expressly excluded Ruth's income from her second job at the McDonald's restaurant. Said Judge Wolff:

"I believe that one is not required to work two jobs. Neither of them during their lifetimes[s] had two jobs of employment. They each had one job.... And one does not have to work all the hours she does....

"If she stops work [at McDonald's], that's one thing, and I've figured it based that she says she does not want to continue. If she goes back to work, then it will be a

change of circumstances. But no one has to work all the time just to survive where the husband is not doing that.... [I]t was a temporary job that she said [she took] to survive and that's all it was meant to be. She is not required to work two jobs."

The trial court then addressed the issue of alimony:

"The wife [is] working, and I don't think she can get any better job than she has now. She is not able to support herself; the husband is.

"There was the question of rehabilitative alimony, and that's certainly out of the question. The wife has not done well in school. Even going back to pick up a couple of courses, they're not going to open up any doors to her.... [S]he is at a level, probably the best that's she going to obtain....

"I think she is entitled to indefinite alimony because of her needs and the disparity between their relative incomes."

The trial court made the alimony contingent upon Ruth not resuming her second, part-time job. It stated that a return to part-time work in addition to her full-time employment would constitute a change in the parties' circumstances sufficient to justify a modification of the award. The final judgment of divorce incorporated this condition.

Robert appealed the award of indefinite alimony in the amount of $300 per month; Ruth did not file a cross-appeal.[1] The Court of Special Appeals affirmed. *Tracey v. Tracey*, 89 Md.App. 701, 599 A.2d 856 (1991). His petition for certiorari having been granted, Robert now challenges the result below on three grounds: (1) that the trial court improperly refused to consider Ruth's income from her part-time employment; (2) that it exceeded its statutory discretion in making an award of indefinite alimony; and (3)

---

1. Ruth engaged a lawyer to act on her behalf before the circuit court and the Court of Special Appeals. She represented herself before this Court.

that it erred in making an alimony award that was conditioned upon Ruth giving up her part-time work.

## II

■ An alimony award will not be disturbed upon appellate review unless the trial judge's discretion was arbitrarily used or the judgment below was clearly wrong. *Brodak v. Brodak*, 294 Md. 10, 28–29, 447 A.2d 847 (1982). This standard implies that appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings. *See Rock v. Rock*, 86 Md.App. 598, 611–612, 587 A.2d 1133 (1991) (providing an excellent synopsis of prior cases).

Maryland's present alimony statute was originally enacted by ch. 575 of the Acts of 1980, now codified as §§ 11–101 through 11–111 of the Family Law Article. It was proposed to the legislature by the Governor's Commission on Domestic Relations Laws. *See McAlear v. McAlear*, 298 Md. 320, 345–346, 469 A.2d 1256 (1984). The legislature adopted the principal substance of the Commission's proposals. Aside from variations in arrangement and phrasing, the substantive provisions of the 1980 Act pertinent here remain unchanged in their current form:

"(a) *Court to make determination.*—(1) The court shall determine the amount of and the period for an award of alimony.

\* \* \* \* \* \*

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of the article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits.

(c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate."

§ 11–106 of the Family Law Article. Maryland's precise formulation of its alimony statute, especially the portions governing an award of indefinite alimony, is unique among the 50 states. *See* Mary Jane Connell, Note, *Property*

*Division and Alimony Awards: A Survey of Statutory Limitations on Judicial Discretion,* 50 Fordham L.Rev. 415, 427–432 (1981).

## III

Robert urges upon us the narrowest, most literal interpretation of the requirement, expressed in § 11–106(b)(11)(i), that a court consider "all income" of a party in determining an alimony award. He argues that the trial court committed reversible error by excluding the $400 monthly that Ruth earned in part-time work at McDonald's. He asserts further that the $400 extra income, when added to her regular wages as a government clerk, enabled Ruth reasonably to support herself, thereby obviating the need for alimony of any kind. We do not agree.

▉▉▉▉ Neither the statute itself nor the 1980 Governor's Commission Report (hereafter the 1980 Report) that spawned it addresses the distinction between income earned from one's principal and full-time position and a temporary, part-time employment. We therefore undertake to divine the legislative intent. While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. *Baltimore Cty. C.A.U.T. v. Baltimore Cty.,* 321 Md. 184, 203, 582 A.2d 510 (1990); *Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761 (1990); *Rucker v. Comptroller of the Treasury,* 315 Md. 559, 565, 555 A.2d 1060 (1989); *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987). The Court will look at the larger context, including the legislative purpose, within which statutory language appears. *Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346 (1990); *Baltimore Cty. C.A.U.T., supra,* 321 Md. at 204, 582 A.2d 510; *Kaczorowski, supra,* 309 Md. at 516, 525 A.2d 628. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. *D & Y, Inc. v. Winston,* 320 Md.

534, 538, 578 A.2d 1177 (1990); *Kindley v. Governor of Maryland,* 289 Md. 620, 625, 426 A.2d 908 (1981).

■ Considering the statute as a whole, and within the context of its larger purpose, we do not interpret § 11-106(b)(11)(i) as requiring a blanket inclusion of wages earned from temporary, part-time work. We have previously defined the purpose of the statute as providing for an appropriate degree of spousal support in the form of alimony after the dissolution of a marriage. *Turrisi v. Sanzaro,* 308 Md. 515, 527, 520 A.2d 1080 (1987) (quoting *McAlear, supra,* 298 Md. at 348, 469 A.2d 1256). In regard to the appropriateness of such support, the statute itself requires that the trial court weigh all factors relevant to "a fair and equitable award." Section 11–106(b). The statute elsewhere invokes the equitable concept of unconscionably disparate standards of living. Section 11–106(c)(2). Its sister provision governing the extension of an alimony period permits the court to act to avoid "a harsh and inequitable result." Section 11–107(a)(1).[2]

We conclude from these provisions that the paramount goal of the legislature was to create a statutory mechanism leading to equitably sound alimony determinations by judges. These provisions temper the statute's contemplated meaning of "all income" in § 11–106(b)(11)(i), which, if interpreted literally, would otherwise defeat the objectives of equity by distorting an assessment of the divorcing parties' real financial condition. An undiscriminating inclusion of all income from part-time work held in addition to primary employment may well exaggerate the means avail-

2. This section provides in full:
"(a) *Extension of period.*—Subject to § 8–103 of this article, the court may extend the period for which alimony is awarded, if:
(1) circumstances arise during the period that would lead to a harsh and inequitable result without an extension; and
(2) the recipient petitions for an extension during the period.
(b) *Modification of amount.*—Subject to § 8–103 of this article and on the petition of either party, the court may modify the amount of alimony awarded as circumstances and justice require."

able to one spouse, or the other, over the long term. Part-time work is often tenuous in prospect and short in duration. To include such income as a matter of course may ultimately result in a false picture of a party's economic self-sufficiency or security. The alimony statute in its entirety renounces an approach based on rote or formula. *Cf. Guardian Life Ins. v. Ins. Comm'r*, 293 Md. 629, 643, 446 A.2d 1140 (1982) (where a particular provision of a statute is part of a single statutory scheme the legislative intention must be gathered from the entire statute rather than from only one part) and *Howard Co. Ass'n, Retard. Cit. v. Walls*, 288 Md. 526, 530, 418 A.2d 1210 (1980) (a statute must be examined as a whole and the interrelationship or connection among all of its provisions considered).

The 1980 Report supports our view respecting the equitable dimensions of the alimony statute, and is properly considered in determining legislative intent. *See McAlear, supra*, 298 Md. at 340, 469 A.2d 1256. In its analysis of the proposed act, the Commission made clear that a court, guided by the appropriate factors, should devise a just alimony award. 1980 Report at 10. More important, the Commission emphasized time and again that each dispute involving alimony be decided on its own merits, on a case-by-case basis, applying the relevant statutory criteria. *Id.* at 5, 6, 7. We interpret § 11–106 as enacting the Commission's stated aim of judicial flexibility, and reject ironclad definitions of statutory language seen in isolation.

█ We thus understand the term "income" as used in § 11–106(b)(11)(i) to signify, in this setting, the wages or salary from regular, full-time employment, *i.e.*, money earned during the normal work week as is appropriate to a given occupation. For a payroll clerk like Ruth, thirty-five to forty hours per week is undoubtedly the norm. The trial court found Ruth's second, part-time job at McDonald's to be temporary work, in the nature of a stop-gap, filling the interim between the Traceys' final separation and the resolution of their financial affairs attendant upon divorce. Ruth worked at McDonald's as many as twenty or twenty-

five additional hours each week. Her work week of sixty to sixty-five hours can only be described as burdensome. Her meager pay from this second job should not, of itself, bar her from receiving alimony. The alimony statute does not consign Ruth to an existence of unremitting toil.

The few reported cases dealing with similar questions in other states have reached a like result. The Supreme Court of Nebraska has held it improper to determine a husband's income from two jobs in calculating his child support and alimony obligations, even though the applicable statutory guidelines required consideration of income from all sources. *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991). The court said of the husband:

> "To satisfy the requirements of his family, he took a second job. He now says he is tired of working 70 hours a week. No worker should be required to work at such a rate for long periods of time, and it is not fair and equitable to require him to do so."

*Id.* 471 N.W.2d at 126. *See also Bingert v. Bingert*, 247 N.W.2d 464, 467 (N.D.1976) (wife's income from a second job as babysitter not a change of circumstances sufficient to modify alimony). The Court of Appeal of Louisiana has refused to compel a husband to take a second job beyond his full-time employment in order to afford larger child support payments. *Naquin v. Naquin*, 405 So.2d 1171, 1172 (La.App.1981).

■ We note, additionally, that the trial court found Ruth's debt service obligation to be about $385 per month. When added to her basic living costs, this sum brought her total monthly requirements up to roughly $2115. Her net income from her government post, investments, and contribution from her son approximated $1400. Thus, even with her $400 in wages from the second job at McDonald's, Ruth's monthly income still fell fully $300 short of her needs; consequently, she was not self-supporting, and the trial court did not err in granting her alimony.

## IV

Robert next challenges the trial court's award of indefinite alimony under § 11–106(c), rather than alimony for a fixed period of time. We have previously observed that the statutory scheme generally favors fixed-term or so-called rehabilitative alimony. *Turrisi v. Sanzaro, supra,* 308 Md. at 524–525, 520 A.2d 1080. The 1980 Report indicated that the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently. 1980 Report at 4. Expressed otherwise, alimony's purpose is "to provide an opportunity for the recipient spouse to become self-supporting." *Id.* at 2. The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living. *Holston v. Holston,* 58 Md.App. 308, 321, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984).

At the same time, the 1980 Report proposed, and the legislature enacted, provisions acknowledging that rehabilitative alimony will not be appropriate in every case. *Turrisi v. Sanzaro, supra,* 308 Md. at 525, 520 A.2d 1080. These provisions are now embodied in § 11–106(c), which recognizes in subsection (1) that some recipients will never be able to progress towards self-sufficiency, and in subsection (2) that unconscionably disparate standards of living between former spouses after divorce may justify indefinite alimony. *See* Rosalyn B. Bell, *Alimony and the Financially Dependent Spouse in Montgomery County, Maryland,* 22 Fam.L.Q. 225, 270–299 (1988) (analyzing indefinite alimony awards).[3] The provisions for indefinite alimony in

---

**3.** Section 11–106, read as a whole, appears to constitute a somewhat paradoxical compromise. On one hand, the legislation favors alimony as a tool of economic rehabilitation; the chief aim is to encourage

§ 11–106(c) serve as a restraint upon the doctrine of rehabilitative alimony; they exist to protect the spouse who is less financially secure from too harsh a life once single again. *See generally,* Joan M. Krauskopf, *Rehabilitative Alimony: Uses and Abuses of Limited Duration Alimony,* 21 Fam.L.Q. 573 (1988) and Anu R. Mathur, *Indefinite Alimony: A Solution to the Financial Trauma of Divorce,* 10 Probate L.J. 303 (1991).

The trial court determined that Ruth was not self-supporting. With that assessment we agree. The trial court found further that Ruth, at the age of forty-six and holding a high-school equivalency diploma, had realized her potential in the labor market. In her few business courses at the college level, she received poor grades. Judge Wolff thus determined that Ruth was not likely to secure any significantly better-paying work in a new field and that, in the language of § 11–106(c)(2), Ruth made as much progress toward becoming self-supporting as can reasonably be expected.

■ There thus arises the question of whether the respective post-divorce standards of living of the parties are unconscionably disparate. Robert, relying upon *Hull v. Hull,* 83 Md.App. 218, 574 A.2d 20 (1990), asserts that Ruth has income sufficient to hold body and soul together, and is therefore, by definition, ineligible for indefinite alimony. That assertion fails. Ruth is not fully self-supporting. Moreover, self-sufficiency per se does not bar an award of indefinite alimony if there nonetheless exists an unconscionable disparity in the parties' standards of living after

and assist the recipient spouse to achieve financial independence. On the other hand, a number of the enumerated factors for consideration are clearly equitable in nature, and have little or nothing to do with the present economic sufficiency of the party seeking alimony, to wit: the parties' standard of living during marriage, the duration per se of the marriage, the parties' non-monetary contributions to family well-being, and the circumstances leading to the parties' estrangement. Some commentators have remarked upon this paradox with regard to alimony statutes generally. *See, e.g.,* Connell, *supra,* at 427; Ira Mark Ellman, *The Theory of Alimony,* 77 Cal.L.Rev. 1, 74–75 (1989).

divorce. A trial court must evaluate and compare their respective living standards as a separate step in making its judgment.[4] It would fall within a court's discretion to award indefinite alimony, for example, to one ex-partner who meets all expenses by earning $12,000 a year as a social worker and living in an inherited home, while the other former spouse earns $150,000 annually as a corporate lawyer. *Hull* is inapposite. There, both spouses were millionaires living in an exclusive community on Gibson Island. The spouse seeking alimony received an annual income of $45,000 from investments alone. It was entirely proper for the trial court in *Hull* to determine that alimony was unnecessary under those circumstances.

The Traceys' circumstances are far different. As we have seen, Robert earned about $61,000 in 1990. Excluding the wages from her second job at McDonald's, Ruth's 1990 earnings were $16,849, or roughly 28% of the husband's income. We decline to adopt a hard and fast rule regarding any disparity between the incomes of parties contesting indefinite alimony. Generally speaking, alimony awards, though authorized by statute, are founded upon notions of equity, *Wallace v. Wallace,* 290 Md. 265, 284, 429 A.2d 232 (1981); equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests. The 1980 Report specifically stated its belief that "different ills call for different remedies"; and that "the matter of relative standards of living [is] to be resolved, as it seems to us it must be, on a case-by-case basis." 1980 Report at 5. The legislature subsequently adopted the Commission's pro-

---

4. The Maryland Court of Special Appeals has correctly interpreted this nuance of § 11–106(c)(2). *See Rock v. Rock, supra,* 86 Md.App. at 608–611, 587 A.2d 1133 (indefinite support warranted where wife had earned as much as $24,000 and husband typically earned in excess of $100,000); *Rogers v. Rogers,* 80 Md.App. 575, 588–592, 565 A.2d 361 (1989) (denial of alimony reversed with directions to consider imbalance between wife's highest salary of $17,500 and husband's income of $115,000 plus bonuses); *Melrod v. Melrod,* 83 Md.App. 180, 196, 574 A.2d 1 (1990) (even after wife's rehabilitation, great disparity in parties' wealth will result in greatly disparate standards of living).

posals in enacting § 11–106(c)(2). The statute by design confers wide latitude upon trial courts assessing requests for indefinite alimony. Judge Wolff did not abuse his discretion in this case.

## V

 The trial court conditioned the grant of indefinite alimony upon Ruth not working at a second job in addition to her government employment. Several passages from the trial court's remarks suggest that income from a second job would simply represent a change in the parties' circumstances potentially justifying reconsideration of the alimony award. Other remarks, and the court's final judgment and order, however, appear to direct that Ruth will automatically forfeit her right to the alimony should she engage in additional part-time work. Such a ruling, we think, is premature. A court should not penalize a divorced person for her industry in working at two jobs. *Moon v. Moon*, 210 Va. 575, 172 S.E.2d 778, 779 (1970). Ruth is free to seek to better her station and material comfort as she thinks best.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, EXCEPT AS TO THAT PART OF THE JUDGMENT WHICH AFFIRMED THAT COMPONENT OF THE JUDGMENT OF DIVORCE ENTERED BY THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY CONDITIONING THE ALIMONY AWARD UPON THE RESPONDENT NOT ENGAGING IN PART–TIME EMPLOYMENT; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH DIRECTIONS THAT THAT COURT VACATE THAT PART OF PARAGRAPH 3 OF ITS JUDGMENT OF DIVORCE CONDITIONING THE AWARD OF ALIMONY UPON THE RESPONDENT'S NOT "ENGAGING IN PART–TIME EMPLOYMENT IN ADDITION TO HER FULL–TIME JOB WITH THE FED-

ERAL GOVERNMENT." COSTS TO BE PAID BY THE
PETITIONER.