619 A.2d 176

**MARYLAND STATE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES**

v.

**Ronnie BAILEY.**

No. 637, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Jan. 29, 1993.

Steven G. Hildenbrand, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Barry C. Steel, Towson, for appellee.

Argued before BISHOP, ROSALYN B. BELL, and CATHELL, JJ.

CATHELL, Judge.

The Maryland State Department of Public Safety and Correctional Services (hereinafter "DPSCS"), appellant, appeals from an order of the Circuit Court of Baltimore County, permitting Ronnie Bailey, appellee, a supervisory

employee of the Division of Correction (hereinafter "DOC"), to represent employees who are not under appellee's direct supervision in grievance procedures where no alleged conflict of interest exists. Appellant raises three issues for our review:

I. Whether the circuit court incorrectly ruled that the administrative law judge's decision was based on an error of law.

II. Whether the decision of the administrative law judge was supported by substantial evidence.

III. Whether the decision of the administrative law judge was arbitrary or capricious.

Appellee presents one issue for our determination:

IV. Whether the circuit court was correct in finding that appellee's First Amendment rights were not affected by the administrative law judge's order.

### Facts

Appellee is a Correctional Officer IV, a Lieutenant, at the Brockridge Correctional Facility. After his promotion to a Correctional Officer IV,[1] appellee became a manager and

---

1. The Department of Personnel (hereinafter "DOP") has described the nature of work and essential requirements of a Correctional Officer IV as:

Ability to supervise employees ... to interpret accurately and *enforce properly institutional rules and regulations....*

This is the first level of supervisory work in the maintenance of security at adult correctional facilities. A Correctional Officer IV is one of several first line supervisors at a large institution or is the third highest officer at a correctional camp. The primary function of this classification is to supervise Correctional Officers I, II and III [in] carrying out the duties of their respective posts and assignments. An employee in this class exercises one of the following functions:

a. *directly supervises* a unit of at least four Correctional Officers I, II or III on an assigned shift at an institution;

b. supervises a unit of at least three Correctional Officers I, II or III who are on a duty assignment extending into several shifts at an institution; *or*

c. regularly functions as the only first line supervisor at a correctional camp.

supervisor of lower-level correctional officers. When appellee was a Correctional Officer III,[2] he did not have any management responsibilities. At that time, he represented employees in grievance proceedings within the DOC. The DOC is a division within the DPSCS.

After assuming a management-level position as a Correctional Officer IV, appellee volunteered to cease representation of aggrieved employees of the Brockridge facility. He did, however, wish to continue representing employees who were not working in that facility and where such representation did not directly cause a conflict of interest.

The DOC did not agree with appellee's wishes, and a conference took place between appellee, appellee's shift commander, and the Assistant Warden of Brockridge, William Filbert. Filbert advised appellee in a follow-up memo to the conference that "supervisors may not represent employees at grievance, suspension appeal, or discharge hearings. That decision is based on three Declaratory Rulings issued by the [DOP]." Filbert's advice was based on a memo from Larry Anderson, Chief of Personnel Services of the DOC, to Mary Leftridge, Assistant Warden. In Anderson's memo, he stated that the DOC's position was that (1) any supervisory DOC employee may not act as a

---

The Correctional Officer IV is responsible for seeing that the employees under his supervision enforce measures designed for the security, control and well-being of inmates and for the protection of State property. . . .

The employee receives supervision from Correctional Officers V and/or VI or other specifically designated higher level employee[s]. He or she may also be directed to assume duties of a Correctional Officer V and/or VI in the latter's absence *and may at times have complete charge of a shift at an institution or of an entire correctional camp and its operations.* In such circumstances, this officer must be ready to act instantly in any emergency situation without the benefit of first counseling with higher authority. *An employee in this class supervises Correctional Officers I, II and III and other assigned personnel.* [Emphasis added].

2. The DOP has described the nature of work of a Correctional Officer III as "This is work on the advanced technical level in the maintenance of security at adult correctional-type facilities."

union representative for any employee of the DPSCS, and (2) any DOC employee having significant supervisory responsibilities was precluded from representing any DPSCS employee at a grievance hearing.

After meeting with Fred Jordan, Jr., the Commissioner of the DOC, appellee was directed on May 31, 1989, that he "may not represent other current or previous employees of the [DOC] or its institutions and agencies at hearings conducted by the [DOP], the [DPSCS], the [DOC] or any agency of the [DOC]." Appellee was authorized to continue representation of any employee who had requested his assistance prior to the Commissioner's directive.

On June 8, 1989, appellee filed a grievance petition, pursuant to the Maryland State Employee Grievance Procedures (hereinafter "procedures"). Md.Ann.Code art. 64A, §§ 52–57 (1988). Appellee filed his petition with the warden claiming, "I am aggrieved because [I] have been denied the right to function as [an] employee representatives [sic] in accordance with commar [sic] regulations and Article 64A of the annotated Code [sic]." On October 31, 1989, a hearing was held, and appellant moved to dismiss on the grounds that the grievance was not timely filed. The hearing officer deferred ruling on the motion to dismiss and accepted evidence in the case. On December 18, 1989, the hearing officer found that the grievance was untimely and dismissed the case. No determination on the merits was made. Appellee appealed the dismissal, and on October 15, 1990, the trial court found that the appeal was timely filed. The case was remanded to the DOP to determine the merits.

A hearing was held on January 25, 1991, before John T. Madden, administrative law judge (hereinafter "ALJ") of the Office of Administrative Hearings (hereinafter "OAH").[3] Both parties agreed that the transcript of the

3. On January 1, 1990, the OAH was created pursuant to Chapter 788 of the 1989 Laws of Maryland and codified in sections 9–1601 through 9–1610 of the State Government Article, Annotated Code of Maryland

October 1989 hearing plus any additional evidence and closing arguments would be the basis of the decision. *The ALJ found that appellee did not have standing to bring suit.* He also found that it was a conflict of interest for appellee, a manager-supervisor, to uphold the DOC's policies on the one hand, and, on the other hand, to represent an employee who had allegedly violated those policies.

Appellee appealed the ALJ's order to the circuit court. The trial court reversed on the grounds that the order was "premised on an erroneous conclusion of the law," *i.e.,* an incorrect application of Article 64A, section 53(b).[4] In construing the meaning of the word "any" in section 53(b), the trial court found that since there was "notably absent [from the statute] ... a restriction on management representation," the Legislature did not intend to exclude managers and supervisors from acting as grievant representatives. Relying on three declaratory rulings issued by the DOP, the trial judge concluded that "[u]nless otherwise shown to be a conflict, an employee who does not have direct supervision over an employee, should not be per se barred from representing grievants because the representative is a supervisor." The trial judge also found that it was proper for appellee to represent employees in grievance proceedings "except in cases of demonstrated conflict of interest which must be determined on a case by case basis."[5]

## Legal Analysis

The trial judge applied the standard for reviewing an administrative agency's decision of a contested case as set

---

(Supp.1992). The hearings section of the DOP thus became part of the OAH. State Gov't § 9–1601 (Supp.1992).

**4.** Article 64A, section 53(b) provides as follows:
Any employee authorized to present a grievance may be represented at any stage of the grievance procedure by any person or persons of his choice.

**5.** Though the trial judge did not expressly affirm or reverse the ALJ's finding that Bailey lacked standing, its decision implicitly overrules that finding.

forth in the Maryland Annotated Code, section 10–215(g) of the State Government Article (1991), otherwise known as the Maryland Administrative Procedure Act (hereinafter the "APA"), which provides as follows:

(g) *Decision.*—In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the decision of the agency; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Appellant contends that (1) the trial court incorrectly applied the standard of review; (2) the ALJ's decision was not based on an erroneous conclusion of the law; (3) the ALJ's decision was supported by substantial evidence; and (4) the ALJ's decision was not arbitrary or capricious. We agree with appellant. We believe, however, that it is necessary to address those issues only to the extent that they relate to our holding that appellee lacked standing to bring suit. We explain.

### Standing

A. The finding

The ALJ ruled that appellee did not have standing to bring suit under Article 64A, section 53(b), because it is "directed to a grievant. The representative, not being a grievant, does not have standing to use this section of the law." The trial court, reversed, stating:

Although the right of choice of representative is given to the grievant in the statute, it is clear that it impacts the individual who seeks to be a representative.... The ruling of the ALJ must be consistent with the legislative mandate to allow a grievant the ability to choose anyone to represent the grievant, including management level people, like appellant.

■ Impact alone, however, is insufficient to confer standing under the APA.[6] In *Maryland Waste Coalition, Inc. v. Maryland Department of the Environment,* 84 Md.App. 544, 581 A.2d 60 (1990), *rev'd on other grounds sub nom., Medical Waste Assoc. v. Maryland Waste Coalition, Inc.,* 327 Md. 596, 622, 612 A.2d 241 (1992), an environmental association brought suit against the Maryland Department of the Environment in response to its issuance of two permits to Medical Waste Associates, Inc., to construct and operate an infectious medical waste incinerator. In addressing the issue of standing under the APA, this Court held that:

In order to have standing to appeal to the circuit court from an administrative decision, a person must (1) have been a party to the proceeding before the agency; and (2) be aggrieved by the agency decision....

. . . .

... *In order for a person to be aggrieved by an agency decision, that decision must affect a specific interest or property right in a way different from that suffered by the public generally.*

*Id.* at 554–55, 581 A.2d 60. *See also Medical Waste,* 327 Md. at 611–13, 612 A.2d 241. The association failed to allege any property interest separate and distinct from its members; this Court held that it was not aggrieved and therefore lacked standing under both the APA and Maryland common law. *Maryland Waste,* 84 Md.App. at 555–56,

---

6. We note that the OAH is an agency to which the contested case and judicial review provisions of the APA are fully applicable. State Gov't §§ 9–1601, 10–102, and 10–201(b) (1991 & Supp.1992).

581 A.2d 60. The Court of Appeals expressly affirmed that portion of the holding referred to above.[7] *Medical Waste*, 327 Md. at 612–14, 612 A.2d 241. *See also Comptroller of the Treasury v. Myers*, 59 Md.App. 118, 120, 125–26, 474 A.2d 941 (1984) (holding that the Comptroller had standing to bring suit since he was authorized to file charges against the employee, he was a party in the proceedings before the agency, and he was "clearly aggrieved" by the court's imposition of a sanction of only thirty days suspension in lieu of discharging the employee).

Appellee in the present case, although the case is contested and although he was a party to the proceeding below, has failed to allege that he has been aggrieved, *i.e.,* that any interest of his has been injured separate and apart from an employee who might be precluded from choosing him as his representative. As we shall explain, the statute confers a right of representation upon an aggrieved employee; it does not confer a right upon a person to represent such an employee. Appellee therefore lacks standing under Article 64A, section 53(b), because he is not aggrieved.

### B. Statutory Construction

The appellee contends that the interpretation of the word "any" in section 53(b) must conform to its plain and ordinary meaning, *i.e.,* "any" includes management-level employees where no actual conflict of interest exists. We do not agree with the appellee that the intent of the statute is gleaned solely from the word "any". We explain.

---

**7.** In *Maryland Waste,* we implicitly held that the environmental group, though it lacked common law standing, might have standing under the Maryland Environmental Standing Act (hereinafter "MESA"), pursuant to the Annotated Code of Maryland, Natural Resources, § 1–502 *et seq.* (1989). 84 Md.App. at 558–60, 581 A.2d 60. We remanded that case to the trial court for a determination of its standing under MESA. 84 Md.App. at 561. The Court of Appeals reversed this portion of our opinion, holding that that act offered no statutory standing to participate in judicial review of administrative decisions under the APA. *Medical Waste,* 327 Md. at 618, 621, 612 A.2d 241.

The Court of Appeals, in its recent case of *Tracey v. Tracey*, 328 Md. 380, 614 A.2d 590 (1992) was asked to construe the equally unambiguous words "all income" and held that these words were not to be interpreted as literally meaning all income. 328 Md. at 387, 614 A.2d 590. In *Tracey*, the Court reiterated the primary rules relating to statutory construction as follows:

> While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which the statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided.

> Considering the statute as a whole, and within the context of its larger purpose, we do not interpret § 11-106(b)(11)(i) as requiring a blanket inclusion of wages earned from temporary, part-time work.

328 Md. at 387-388, 614 A.2d 590 (citations omitted). *See also Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 462-63, 597 A.2d 939 (1991) (holding that the "plain meaning rule" is not rigid and "does not force us to read legislative provisions in rote fashion and in isolation ... results that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning."); *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513-14, 525 A.2d 628 (1987) ("legislative intent must be gleaned from the entire statute, rather than from only one part.").

In *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 71-72, 517 A.2d 730 (1986), the Court was asked to construe the meaning of the word "pedestrian," under Article 48A, sec-

tion 539(a) (1986 Repl.Vol.) of the Annotated Code of Maryland, the statute that provides for a measure of compensation to victims of motor vehicle accidents without regard to fault. Pedestrian was not defined in section 539(a). It was, however, defined in the Transportation Article, section 11–145 (1984 Rep. Vol.), as "an individual afoot." *Id.* at 72, 517 A.2d 730. The plaintiff was employed as a parking lot attendant and was struck by the defendant's automobile while sitting on a stool inside the attendant's booth. *Id.* The Court opined:

> Nor do we think that a literal application of the word "pedestrian," in the context of its usage in § 539, was necessarily intended by the legislature in view of the unjust and unreasonable consequences that would obviously flow from such an interpretation.... Thus, under such a limited application, an individual seated on the steps of a building in front of a public highway who is struck by a motor vehicle would be unable to collect PIP benefits while another individual walking on the steps of the same building would be covered.

*Id.* at 74–75, 517 A.2d 730.

In the instant case, we perceive that the Legislature wanted to assure that State employee grievants would not be limited to a certain class of representation, *i.e.*, attorneys or union agents. We believe it was in this context that the word "any" was used. As we interpret the statute, it was not meant to interfere with management's ability to make policy decisions limiting the role of its supervisors in the context of management-employee disputes. We explain.

Article 64A, sections 52 through 55 of the Annotated Code of Maryland (1991), provide the procedures for a State employee to file a grievance. The General Assembly enacted the legislation "[f]or the purpose of providing a procedure by means of which all State employees of the executive branch of the State government with certain exceptions may present grievances; and relating generally to State employee grievances." Act effective July 1, 1977, ch. 727, 1977 Md. Laws 2919, 2920. An additional purpose, as

stated in a hand-written note contained in the Senate Bill File, was "to codify a procedure [DOP Policy #9 and Governor's Executive Order of July 3, 1974] so that it will not change if administration changes." House Committee on Appropriations, S.B. 677, B.F. (1977). The DOP's policy that was purported to be codified stated:

In order that public employee relations be im-proved....

... It is the responsibility of all supervisors, adminis-trators, program directors, appointing authorities, and employees to establish and maintain a work climate with-in which an employee's problem or complaint may be promptly identified, presented, discussed and given *fair*, timely consideration.

*Id.* (emphasis added).

As codified, there are three steps in the procedures which must be exhausted before judicial review is permitted. Md. Ann.Code art. 64A, § 54(a) (1988 & Supp.1992). The first step is the initiation of the complaint, beginning with an "informal discussion with the *supervisor.*" Art. 64A, § 54(a)(1). The procedures require that "[e]very effort shall be made by *both parties*[8] to resolve the grievance at the lowest possible level." Art. 64A, § 55(d). The employ-ee must then submit a written grievance to the "appointing authority,"[9] or a designated representative. Art. 64A, § 54(a)(1). The authority is required to hold a conference with the aggrieved employee or his representative and must issue a "written decision to the aggrieved within 15 days after the conclusion of the conference." Art. 64A, § 54(a)(2). In step three, if the employee remains unsatis-

---

8. "Party" is defined in the Code of Maryland Regulations as "an employee having a grievance or the aggrieved employee's appointing authority, or both." Md.Regs.Code tit. 6, § 06.01.01.56(2)(b) (1992).

9. "Appointing authority" is defined in the regulations as a "person who has the power to make appointments and to terminate employ-ment." Tit. 6, § 06.01.01.01.

fied, he may submit the dispute either to arbitration [10] or to a hearing before the Secretary of Personnel. Art. 64A, § 54(a)(3).[11] "The Secretary of Personnel shall make the final decision which shall be binding on all parties." Art. 64A, § 54(a)(3); Tit. 6, § 06.01.01.56. The employee bears the burden of proof in grievance hearings. Tit. 6, § 06.01.-03.05(c).

In looking at the statute in its entirety, we hold that it would lead to results that are unreasonable, illogical, and inconsistent with common sense to mandate that a management-level employee be required or permitted to represent an aggrieved employee at a grievance hearing where management policies, or the application of them, are challenged.

Although section 53(b) states that an employee may choose "any person" to represent him at "any stage" of the grievance proceedings, in many instances it may be extremely difficult, if not virtually impossible, for a manager/supervisor to represent management *and* simultaneously to represent an aggrieved employee on the same issue. Management personnel, almost by definition, are continuously bound by management policy to further that policy. As we have pointed out, the initial stage of a proceeding is with an employee's supervisor. If, as appellee argues, the use of the words "any person" must be given their literal meaning, so would the words "any stage." Thus, a literal application of the statute would lead to an inevitable illogical conclusion; the employee could be represented by his immediate supervisor at the initial stage where that supervisor is also management's representative. We do not

---

**10.** Arbitration was not chosen in the present case; we therefore do not discuss its application.

**11.** The Secretary of the DOP "shall assure that both parties receive a full and *fair* hearing." Tit. 6, § 06.01.03.07 (emphasis added). We note that agency hearings are now conducted by the OAH, for any agency that "employs or engages one or more hearing officers to adjudicate contested cases unless the agency has been exempted by the Governor...." Md.Code Ann., State Gov't § 9–1601(b) (Supp. 1992).

believe that the Legislature intended the use of the word "any" to create a right in supervisors to act as representatives. That construction, as we have said, would be "unreasonable, illogical, unjust, or inconsistent with common sense." *Tracey*, 328 Md. at 387, 614 A.2d 590. Because supervisors do not have a right to act as representatives, appellee was not "aggrieved" by the agency's decision and therefore lacks standing to maintain this action.

■ Appellee contended at oral argument that the issue of standing had not been raised below and was therefore not preserved for our review. As we have noted previously, the ALJ expressly found a lack of standing. By reversing that decision, the trial court rejected that finding even though the trial court made no explicit statement as to standing. The trial court conducted its review on the record made before the agency. Section 10–210(10) of the APA provides that a "final ruling . . . for the agency, including each report or opinion issued in connection with the ruling," is part of the record. State Gov't § 10–210(10) (1984). The issue of standing was thus before the trial court and, albeit by inexact language, was resolved by that court.

The Court of Appeals has discussed two views as to the raising of standing issues on appeal. In *Munson v. Secretary of State*, 294 Md. 160, 170, 448 A.2d 935 (1982), *aff'd*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the Court of Appeals addressed, but did not decide, whether standing could be raised on appeal *by an appellee*, when it had not been raised below. The Court there opined that there were two views as to standing under such circumstances, stating, "[I]f the plaintiff's alleged lack of standing is not properly raised by the defendant, an appellate court will not consider the matter." *Id.* at 169, 448 A.2d 935. It suggested that another view was "[T]hat the standing of a plaintiff to maintain an action is an issue which an appellate court will address on its own motion." *Id.* at 169, 448 A.2d 935 (citations omitted). In any event, the view first stated in *Munson* that opines that standing cannot be raised for

the first time on appeal, to the extent it is not dicta, as we read it, applies only when an *appellee* attempts to raise such an issue. Even then, it is based on the theory that an appellee who does not file a timely appeal may not thereafter insert an issue not raised in the appellant's brief. *See also Paolino v. McCormick & Co.*, 314 Md. 575, 579–82, 552 A.2d 868 (1989) (explaining the holding in *Munson* as permitting an appellee, or an appellate court *sua sponte*, to raise the issue of standing where there is an alternative ground to uphold the trial court's ruling). Appellant, in the case *sub judice*, prevailed before the agency on the issue of standing. The circuit court resolved the case against appellant, and appellant filed its appeal of the reversal of the agency's findings. At oral argument, the issue of standing was again raised. Under these circumstances, we conclude it proper to address the issue of standing.

C. *Meaning of Grievance Under the Procedures*

■ In addition to our holding that appellee lacks standing under Article 64A, section 53(b), we hold that appellee lacks standing under section 52(b). We do not believe that the appellee's complaint falls within the meaning of "grievance" under the statute. Grievance is defined in Article 64A, section 52(b) as follows:

> (b) "Grievance" means any cause or complaint unless otherwise provided for under this article arising between an employee and his employer over the interpretation and application of State employee personnel rules, regulations, policies or any other rules, regulations or policies over which management has control.

The Maryland Attorney General [12] was asked to determine whether the grievance procedures applied to policy decisions made by the Secretary of Budget and Fiscal

---

**12.** We note that although the Attorney General's opinion in interpreting legislation is not binding upon this Court, it is entitled to careful consideration. *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 548, 489 A.2d 1114 (1985); *Automobile Trade Ass'n v. Harold Folk Enters.*, 301 Md. 642, 662, 484 A.2d 612 (1984).

Planning in exercising his responsibility to fix, and where appropriate, alter the number and classes of positions appropriated for each of the State's agencies, units, and programs. 64 Op.Att'y Gen. 146 (1979). An employee of the Department of Health and Mental Hygiene filed a grievance against the Secretary due to his refusal to reclassify his position, which was specifically provided for by the budget, so that he would be eligible for teaching salary supplements. *Id.* at 147.

In analyzing the scope of the State Employee Grievance Procedures, the Attorney General found that the Secretary's refusal to reclassify a position fixed by him and provided for in the budget was "not a grievable matter" because it did not fall within the definition of grievance under section 52(b). *Id.* at 148. First, the Attorney General found that the dispute was not between an "employee and his employer" since the Department of Health and Mental Hygiene was the employing agency. *Id.* Second, the Attorney General found that the Budget Bill and the authority delegated to the Secretary under that bill were not considered "State employee personnel rules, regulations, policies ... over which management has control." *Id.* The Attorney General further found that the Secretary's responsibilities were "analogous to the responsibilities of those other departments of the State government that are given broad policy-making authority by the General Assembly." *Id.* at 149.

The DPSCS has been given "broad policy-making" authority by the Legislature. The DPSCS was created as "a principal department of the State government." Art. 41, § 4–101(a). The Secretary of DPSCS, in carrying out his responsibility for the operation of the department, has been directed by the General Assembly to establish guidelines and procedures to promote its *"orderly and efficient administration."* Art. 41, § 4–101(c) (emphasis added). In the case at bar, the Commissioner of the DOC, a designee of the Secretary, was exercising his authority in making a

policy decision to prevent potential conflicts of interest within the department.   Art. 41, § 4–103(b).

It necessarily follows, we believe, that the agency retains the inherent power to adopt a policy limiting the right of its management level employees to conduct activities in direct opposition to management policy.   While it is certainly possible that not all grievances would necessarily adversely impact upon that policy, it is entirely logical to anticipate that positions contrary to management policy or directives will frequently occur.   A policy of prohibiting management employees from representing employees is, as we see it, reasonably designed to avoid the frequent conflicts that are likely to occur and would promote the "orderly and efficient administration" of the agency or agencies.

The decision of DPSCS that supervisors not be permitted to represent employees against management was a policy decision; it did not, however, relate to conditions of employment.   The provision that permits an aggrieved employee to select "any" person to represent him does not limit the choice to employees of the agency of the State.   His choice may be a lawyer, a doctor, a commercial fisherman, a clergyman, a migrant laborer, *i.e.,* anyone who is willing *and* permitted to serve.   Whatever right exists to choose a representative is not a right limited to selecting an employee of the State.   It is a general provision that transcends or goes beyond the agency.   Appellee's complaint does not therefore fall within the State Employee Grievance Procedures because it does not arise out of the provisions relating to his duties and responsibilities as a supervisor, the position in which he is employed.

D.   *Whether the trial court was correct in finding that appellee's First Amendment right to free speech was not violated*

Appellee contends that "an unreasonable restriction on his ability to serve as a grievant representative is a restriction on his right to free speech."   We disagree.

■ Appellee's First Amendment claim is merely another attempt to assert the rights of a grievant who is not before this Court, *i.e.*, the right of an aggrieved employee to choose his own representative. As we have stated, whatever right exists under the statute is conferred upon an aggrieved employee. It is a well-settled principle that a litigant generally *may not* assert the constitutional rights of persons not before the court in order to obtain relief for themselves. *Warth v. Seldin*, 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). Here, appellee has not made any claim of injury to himself personally—only to a grievant who, in the future, may wish to choose appellee to represent her. If "free speech" were an issue, it would be the "free speech" of the grievant, not of appellee. Even under appellee's theory, appellee would be "representing" a grievant's rights—not his own. The injury, if any, is inflicted upon the grievant, not the representative.

Appellee does not fall within any of the exceptions that permits a litigant to assert the rights of a third party. *Barrows*, 346 U.S. at 259, 73 S.Ct. at 1036 (holding that a litigant may have standing to bring suit on behalf of another where that person's constitutional rights will be impaired, and the litigant is the "only effective adversary"); *Pierce v. Society of Sisters*, 268 U.S. 510, 535–36, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925) (holding that it was proper for a litigant to bring suit on behalf of parties not before the court where a special relationship existed, the relief sought would remove injury to the litigant, and the litigant was an effective proponent of third-party rights). Appellee therefore lacks standing to raise the First Amendment claim presented here.

JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.