730 A.2d 202

**Edward S. DIGGES, Jr.**

v.

**Wendy W. DIGGES.**

**No. 520, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

May 26, 1999.

362

Edward S. Digges, Jr., Glen Arm, for appellant.

Mary C. Baldwin and Brassel & Baldwin, P.A., Annapolis, for appellee.

Argued before WENNER, DAVIS and HOLLANDER, JJ.

HOLLANDER, Judge.

This case is before us for the second time. It arises from the dissolution of the marriage of Edward S. Digges, Jr., appellant/cross-appellee, and Wendy W. Digges, appellee/cross-appellant. The parties were divorced on July 28, 1995, after twenty-six years of marriage, on the ground of a two year separation. *See* Md.Code (1984, 1991 Repl.Vol.), § 7–103(5) of the Family Law Article ("F.L."). In conjunction with the divorce, the court awarded sole custody of the couple's three minor children to Ms. Digges. For purposes of calculating child support and alimony, the trial court found that Mr. Digges had voluntarily impoverished himself, and ordered him to pay 1) child support in the amount of $1,312.62 per month; 2) indefinite alimony in the amount of $2,250 per month; and 3) and appellee's counsel fees, in the amount of $25,000.

Thereafter, in an unreported, *per curiam* opinion, this Court affirmed the lower court's determination that appellant had voluntarily impoverished himself. Nevertheless, we determined that the trial court erred in its conclusion as to appellant's earning potential. Accordingly, we remanded the matter to the trial court to re-compute appellant's potential income, and to reconsider appellant's obligations for child sup-

port, alimony, and attorney's fees. *Digges v. Digges,* No. 493, September Term, 1996, 114 Md.App. 720 (filed February 25, 1997)(hereinafter, *"Digges I "*). Appellant now challenges the trial court's rulings on remand, and presents several issues for our review, which we have rephrased and consolidated:

   I.   Did the court err in using appellant's potential income in determining the awards for child support, alimony, and attorney's fees, rather than his actual income?

   II.  Did the court err in awarding indefinite alimony to appellee?

In her cross appeal, appellee presents one issue for our consideration, which we have also rephrased:

For purposes of determining the amount of the award of indefinite alimony, did the court err by including income from appellee's part-time job?

We answer each question in the negative. Accordingly, we shall affirm.

### Factual Background[1]

Mr. and Ms. Digges were married on May 31, 1969. Five children were born to the couple: Courtney, born October 3, 1974; Edward III, born April 27, 1976; Ashley, born October 27, 1979; John Bradford, born May 17, 1981; and Brittany Anne, born September 19, 1982.

Appellant holds a bachelor's degree from Princeton University and a law degree from the University of Maryland School of Law. After his admission to the bar, Mr. Digges began a successful and lucrative career as a commercial litigator with a distinguished Baltimore law firm. In 1984, appellant founded and became the managing partner of the Annapolis law firm of Digges, Wharton, and Levin, earning a substantial income. After Mr. Digges founded the Annapolis firm, the Digges

---

**1.** In our view, the parties presented their summaries of the facts in partisan fashion. In any event, in view of the history of this case, and the particular issues presented, we need not fully recount all that has transpired here.

family lived on a waterfront property in Kent County, Maryland called "Hinchingham."

Ms. Digges received her bachelor's degree in elementary education from Towson State University in 1970. Between 1970 and 1974, she taught in Baltimore City and Anne Arundel County. When the couple's first child was born in 1974, appellee left her job as a school teacher and became a full-time homemaker.

In November 1989, appellant was indicted in federal court on six counts of mail fraud. Those charges stemmed from an allegation that Mr. Digges fraudulently overbilled one of his firm's clients, Dresser Industries, Inc. ("Dresser"). On January 16, 1990, appellant voluntarily consented to disbarment. Digges subsequently pled guilty to one count of mail fraud and was incarcerated at the Federal Correctional Institution in Morgantown, West Virginia from May 7, 1990 until April 27, 1992. In addition, Mr. Digges was fined $30,500, and ordered to pay one million dollars in restitution to Dresser.

Dresser industries ultimately obtained a judgment of three-and-one-half million dollars against appellant and his two law partners, jointly and severally. Although Mr. Digges filed for bankruptcy, the judgment was not discharged.

On September 28, 1992, Ms. Digges was diagnosed with multiple sclerosis. Notwithstanding the news, appellant left the marital home the next day. It was later discovered that appellee suffers from a "stress related condition," but not multiple sclerosis.

On August 30, 1994, appellant filed a complaint for absolute divorce in the Circuit Court for Kent County. Thereafter, on October 11, 1994, appellee filed a counterclaim, alleging desertion and adultery. Ms. Digges sought rehabilitative and indefinite alimony, sole custody of the couple's children, child support, a monetary award, costs, and attorney's fees.

Trial was held from May 25, 1995 through June 1, 1995. At trial, Martin Kranitz, an expert in vocational evaluation, testified on behalf of Ms. Digges. He opined that appellant could

potentially earn from $60,000—$75,000 as a non-attorney representative for Social Security clients.

On July 28, 1995, the court filed a written Memorandum Opinion, Order and Judgment. The court prefaced its discussion of the background facts with the following statement:

[E]xcept for her ability to give a fair market value on property, the court gives full credibility to the testimony of Wife. On the other hand, the court does not find Husband to be as creditable [sic] a witness.

In making its rulings as to alimony, child support, and counsel fees, the court found that, in 1994, Ms. Digges earned approximately $3,200.00. The court observed that appellee "is looking for full-time employment as a teacher where she would probably earn approximately $30,000.00 per year." The court also recognized that Mr. Digges "has not maintained regular employment since his release from prison in 1992, [but] he either directly or through his family was able to provide approximately $5,000.00 per month to [Ms. Digges] for the support and maintenance of the family." That support, however, "ended coincidentally with the filing of [Ms. Digges's] Response to the Complaint in October of 1994." Moreover, the court concluded that since his incarceration, Mr. Digges had "chosen to deprive himself of resources with the intention of avoiding financial obligations, which not only include the Dresser judgment, but include child support and spousal obligations."

The court examined each of the factors prescribed in F.L. § 11–106(b) regarding alimony. In a section entitled "[t]he ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony", see F.L. § 11–106(b)(9), the court stated:

Husband claims he is unable to obtain gainful employment until after he has completed his master's degree from the University of Pittsburgh. He claims that he is unable to work in the field of law as anything more than a paralegal, due to his conviction for mail fraud. At the time of his conviction, Husband surrendered his license to practice law.

Since his release from prison, Husband has occasionally worked as a consultant, where at one point he was paid $75,000.00. He has also assisted his father and other family members by giving advice and by helping to maintain the family properties.

While not all mail fraud convictions result in disciplinary sanctions being imposed by the Court of Appeals, the facts of this case which indicate fraudulent billings to clients would likely indicate the imposition of sanctions. It is understandable why Husband surrendered his license to practice law prior to sanctions being sought. That does not, however, explain why Husband has not sought gainful employment. Husband uses his conviction as a reason for not having employment. He has no history of rejection from application for employment.

He also uses his current enrollment in a Master's for Business Administration as a reason for not being employed. There has been no proof that the program in which he is enrolled is a full-time program which would prohibit him from maintaining employment while completing his additional education. The program appears to be designed for the working student.

This court is convinced that Husband refuses to maintain gainful employment because he has no intention of satisfying the judgment lodged against him by Dresser. Presumably, if he has no visible earnings, Dresser has nothing to garnish or attach. Clearly husband has chosen to deprive himself of resources with the intention of avoiding financial obligations, which would not only include the Dresser judgment, but include child support and spousal obligations. In making this finding, the court has considered the following:

a.   Husband's current physical condition is good;

b.   Husband is a graduate of Princeton; he holds a Law degree and is soon to have a Master's in Business Administration'

c.  Husband's employment as an attorney changed at the time of his conviction, however, he has had three years since his release in which to obtain gainful employment;

d.  Husband, either directly or indirectly, provided for his wife and family prior to her response to his complaint for divorce.

e.  Husband has shown no effort toward finding or retaining employment;

f.  Husband is seeking a Master's in Business Administration, a form of retraining, however, he is making no effort toward obtaining employment while seeking that retraining;

g.  Husband has not supported his children or maintained his spouse since October of 1994;

h.  Husband was a very successful attorney and since his release from prison has held himself out to be a "consultant" with one client having paid him $75,000.00;

i.  Husband's official address is at the Hinchingham farm in Kent County, however, at any given time he can be found at family property in Southern Maryland or with a friend in Baltimore County. The court finds that the Husband's job market would encompass the mid-Atlantic region. The court finds that there is room in the market for business consultants such as someone with Husband's credentials;

j.  The court will also consider at this time that Husband maintains a comfortable life style, including his membership at the Princeton Club in New York City.

*See John O. v. Jane O.*, 90 Md.App. 406, 422, 601 A.2d 149 (1992).

Husband has voluntarily impoverished himself. Therefore, the court finds that Husband has the ability to meet his own needs while meeting the needs of his Wife. *Husband earns $75,000.00 from one client, therefore, the court finds Husband is capable of earning at least $75,000.00 per year from outside sources and that he receives at least $25,000.00 per year "compensation" for services rendered to his family, albeit that compensation has been labeled as*

*"loans" and "gifts."* The court finds that Husband is capable of earning at least $100,000.00 per year in total. (Emphasis added).

As we noted, the court found that after appellant's release from prison, he earned $75,000.00 from one client, for consulting services. This finding was based on evidence that while appellant was in prison, he provided consulting services to Gary VanWaeynberge, a fellow inmate. Appellant testified that he offered VanWaeynberge " 'advice relative to ventures that he [VanWaeynberge] was attempting to get under way here in the United States one way or the other.' " *Digges I,* slip op. at 7. The court then calculated appellant's child support obligation based on an estimated annual salary of $100,000.00 for him, and a salary of $6,000.00 per annum for appellee.

On August 30, 1995, the court amended its judgment, concluding that, as of June 30, 1995, appellant was $11,813.58 in arrears in child support, and $20,250.00 in arrears in alimony. Although the court originally ordered rehabilitative alimony, it revised the award by making the alimony permanent. The court explained that "[a]fter [Ms. Digges] will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." *See* F.L. § 11–106(c)(2).

Appellant subsequently appealed to this Court. He argued, *inter alia,* that the trial court was clearly erroneous in finding that he had voluntarily impoverished himself. In appellant's view, "the only reason for his current state of 'impoverishment' is his conviction, incarceration, and surrender of his license to practice law." *Digges I,* slip op. at 9. Appellant also challenged the court's awards, arguing that they were improperly based on an erroneous finding that he had an earning potential of $100,000.00.

In *Digges I,* we affirmed the court's ruling that appellant had voluntarily impoverished himself. We held that "the evidence was sufficient to show that the primary cause of

appellant's impoverishment was not his incarceration nor the loss of his law license but his total lack of interest or effort in attempting to find and secure regular, gainful employment." Further, we said:

Slothfully, [appellant] waited for more than a year after his release from prison to start graduate school and even then he selected a part-time educational program designed for a person who held a part-time job. By showing initiative, Digges, like his fellow students, could have worked and attended college. We are persuaded that a rational trier of fact could have found that Digges was voluntarily impoverished.

*Id.*, slip op. at 11.

Nonetheless, we reversed the court's finding that appellant had a potential income of $100,000.00. That income figure was based in large measure on the court's determination that, subsequent to Digges's release from prison, one client had paid him $75,000.00 for consulting services. We concluded, however, that the trial judge erred in finding that appellant had earned the $75,000. We explained: "Apparently, the trial judge confused the $75,000.00 figure with the actual figure of $87,500.00 and then assumed the money was paid for services rendered while imprisoned and not as a loan." We also found that even if appellant had earned $75,000.00 as a consultant in prison, "there was no evidence to support the assumption that he could continue to earn that amount of income on a regular basis" when released. Accordingly, we remanded "for a re-evaluation of Digges's potential income and for a re-determination of the appropriate level of child support based upon the guidelines." *Id.*, slip op. at 14. Further, we indicated that, "[o]n remand, the trial court, in its discretion, *may receive additional evidence regarding potential income, including testimony as to appellant's income since the case was originally tried.*" *Id.* (Emphasis added).

Significantly, we rejected appellant's claim that the award of alimony could not be calculated based on appellant's potential income. To the contrary, we said that potential income is

relevant to a consideration of "[t]he ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony." *See* F.L. § 11–106(b)(9). With respect to the award of attorney's fees, we also noted that F.L. § 11–110(b) requires the court to consider "the financial resources and financial needs of both parties." We observed that "[t]he factors underlying awards of alimony, monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other." Slip op. at 17 (quoting *Doser v. Doser*, 106 Md.App. 329, 335 n. 1, 664 A.2d 453 (1995)).

From October 20, 1997 through October 22, 1997, the circuit court conducted a remand hearing. Ms. Digges testified about her ordeal in securing adequate housing and providing for her children during the pendency of the divorce proceedings. She explained that Hinchingham had originally been titled to the parties as tenants by the entireties, but claimed that her name was removed from the deed without her consent. Although appellee's signature appeared on a deed conveying her interest in the property, she averred that the deed was notarized by one Loretta M. Poole, a woman whom Ms. Digges claims she never met. Around the time that appellant's legal troubles began, appellant, who was then the sole owner of the property, conveyed Hinchingham to his father.[2] Although appellant's father allowed Ms. Digges and the children to live at Hinchingham until October 1994, economic assistance from the Digges family ceased when Ms. Digges filed her counterclaim for absolute divorce. Consequently, in October 1994, appellee and the children moved to a rental property. Then, on May 26, 1995, the family was evicted from the rental property, and they were forced to live rent free at a local church. Subsequently, Ms. Digges and the children moved to a two-bedroom apartment in Chestertown. Appellee testified that she slept on a mattress on the floor in the living room so that her two youngest children could sleep

---

**2.** We have not been able to locate the sales price in the record.

in the bedrooms. As a result of the family's eviction and economic uncertainty, appellee claimed at trial that she suffered from anxiety, sleeplessness, and severe allergies. She also acknowledged that she is particularly afraid of being evicted again.

Charles Smolkin, an expert witness in the field of vocational assessment and income potential, testified for appellee. Smolkin did not testify at the first trial. In Smolkin's view, appellant's background was best suited to the field of telecommunications consulting. Citing the 1996–1997 edition of the *Licensing Occupational Outlook Handbook,* published by the U.S. Department of Labor, Bureau of Labor Statistics, Smolkin stated that appellant "fit the profile of a junior or senior partner in a consulting firm." The average salary in 1994 for such a position was $194,000.00. Smolkin opined that appellant is capable of annual earnings ranging between $120,000 and $194,000. In this regard, Smolkin explained that given appellant's work as a telecommunications consultant, he is capable of overcoming much of the stigma associated with his disbarment and mail fraud conviction. The following colloquy is relevant:

> [ATTORNEY FOR APPELLEE]: What role or influence do you feel that the felony conviction and the disbarment play in terms of his work in the area of consulting?

> SMOLKIN:[3] The disbarment is important because I had to consider whether he's likely to be readmitted to the bar anytime soon, which, of course, would negate my having to make a judgement [sic] because he has already demonstrated his abilities in that arena. And I have no evidence that he is going to be readmitted to the bar anytime in the near future.

> \* \* \*

> [ATTORNEY FOR APPELLEE]: With regard to the felony conviction as it relates to the type of work that he's

---

3. In the transcript, the witness's name is spelled "Smalkin".

doing and as it dovetails with his history of employment, how do you feel that that plays a role if at all?

SMOLKIN: Do you know, in talking to him, if I didn't know the reality, I would say there's no felony conviction. And I think that is important because he's ... as a ... as a consultant, he is dealing with a field that does not require licensing and there's no necessary objective standard. And as he explained it to me, it appeared very logical that he had ... was an outstanding attorney who, through a gross misunderstanding of the billing method at a time when they weren't necessarily so contractual, ended up being a victim and serving time because he was a victim not because he did anything wrong. Now, I know that facts of the case.

[ATTORNEY FOR APPELLEE]: Do you believe ... do you believe that, based on your interview, he's able to portray the victim role in a way that is convincing in terms of sales and marketing?

SMOLKIN: Yes. I ... I believe that he can ... he can take this conviction and explain it in a very logical manner and make the bad guy the government and the good guy Mr. Digges.

         �ע      \*      \*

[ATTORNEY FOR APPELLEE]: Do you believe that ... the felony conviction is a significant hurdle or obstacle?

SMOLKIN: It's an obstacle that would be significant for most people but not for Mr. Digges, not in this field.

Mr. Digges's income tax returns reflected income in 1995 of $10,617.00. In 1996, he reported $29,558 on his income tax return.

On December 9, 1997, the court issued its written opinion, in which it discussed, *seriatim*, each of the factors set forth in F.L. § 11–106(b) regarding alimony. Six pages of the court's analysis on remand concerned the question of whether Mr. Digges could meet his own needs while meeting the needs of appellee and the couple's children. In addition, the court focused on Smolkin's testimony.

In its opinion, the court made the following findings regarding appellant's employment history:

[T]he evidence revealed that Mr. Digges was employed by the law firm of Piper/Marbury in 1971. By 1977, he was a partner for that firm. In 1984, he earned approximately $375,000 spending half of his efforts in marketing and developing the firm's client base. At the end of March, 1984, he left that firm and became managing partner for his own firm, Digges, Whorton [sic], and Levin. In 1988, Mr. Digges earned approximately $750,000. According to Mr. Smolkin's research, this figure is almost seven times more than the average yearly salary of the most experienced lawyers in private industry in 1993.

Except for doing work for his family, he was not employed during 1992, 1993, and 1994, the years following his felony conviction. During 1995 and the main part of 1996, Mr. Digges worked as a part-time consultant for a telecommunications company called Telvest. From the end of 1996 to the present he has been employed as a consultant with Corcom.[4]

The court also found that appellant has continued to avoid finding new employment. It stated:

Mr. Digges has made little or no effort at finding and retaining meaningful employment. Although the Court acknowledges that Mr. Digges currently works part-time for Corcom, testimony revealed that his position evolved out of casual conversations between himself and the owners, who are social friends, rather than any real effort to secure employment. Those facts are consistent with the answers that Mr. Smolkin received when he asked Mr. Digges how

---

4. "Corcom", or Corporate Communication, LLC, specializes in corporate telephone communications systems. Richard McGonnigal testified at trial as a corporate designee of Telvest and Corcom. According to McGonnigal, appellant provided consulting services to Corcom regarding potential markets for its long distance services. Corcom did not keep track of appellant's hours, but the company expected Digges to work "a couple of weeks a month." McGonnigal testified that appellant was free to work for other companies.

he hopes to obtain consulting positions. Mr. Digges apparently answered that "he lets it be known" that he is seeking employment in the consulting field.

To date, Mr. Digges has yet to prepare a curriculum vitae or fill out even one application for a job. In Mr. Smolkin's opinion, Mr. Digges will never fill out an employment application because he considers such a task to be "beneath" him. When asked why he had not prepared a curriculum vitae, Mr. Digges told Mr. Smolkin that he has been working on obtaining his MBA. However, Mr. Digges's transcript from the University of Pittsburgh reveals that he is enrolled in a Flex Program designed for working adults. The program requires residence for only two weeks out of twelve. Despite the liberal schedule, Mr. Digges has completed the requirement for only eight credits toward his MBA. He has failed to meet the minimum standards on three credits, he had failed three credits, and he has twenty-five credits with unfinished work. Mr. Smolkin testified that given his academic achievements, Mr. Digges's performance at the University of Pittsburgh is almost incomprehensible. Thus, Mr. Smolkin concluded that [appellant's] poor performance further evidences is [sic] lack of effort at finding or obtaining employment.

Further, the court noted that appellant "expects to earn approximately $50,000 in the upcoming year." Notwithstanding his mail fraud conviction, the court also found that appellant had an annual earnings potential of $150,000.00. Nevertheless, the court conceded that appellant could not immediately reach the $150,000 plateau, stating:

In reaching this decision, this Court accepts the proposition that someone entering a new field, even with Mr. Digges's extraordinary capabilities, will require a period of time during which he can reestablish his contacts. Therefore, the Court finds that from October 31, 1994 to October 30, 1996, Mr. Digges had the potential to earn $85,000 per year; from October 31, 1996 to October 30, 1997, he had the potential to earn $100,000; from October 31, 1997 to October 30, 1998 he has the capability to earn $125,000 until

finally reaching his full earning potential of $150,000 per year on October 31, 1999.

In addition, the court recognized that appellant "has an extensive support system". The court also observed that appellant "continues to have memberships in the Princeton Club and the Mid–Ocean Club in Bermuda despite his limited income."

As to Ms. Digges's income, the court found that since the time of the first trial, she had obtained full-time employment as a teacher at the Radcliffe Creek School in Kent County, earning a salary of $27,000 per year. She was certified to teach special education using the "Ortin Gillinham" method. Additionally, Ms. Digges earned an additional sum of $2,230.00 by teaching during the summer vacation. The court also found that appellee "continues to earn approximately $240/ month by tutoring privately."

A financial statement completed by Ms. Digges on October 20, 1997 indicated that, on the eve of the remand hearing, she had expenses of $30,912 per year.[5] The court found, however, that the October 1997 figure was too low, and represented an "unrealistic indication[ ] of what Mrs. Digges should spend per month in order to procure adequate housing and sustenance for herself and the Digges children." Accordingly, the court found that beginning in October 1997, Ms. Digges required $39,000.00 per year to meet her expenses. The court calculated appellant's child support obligation based on appellant's graduated "potential" incomes, and Ms. Digges's "actual" incomes. The court summarized its findings regarding the parties' incomes in the following chart:

---

**5.** The financial statement was submitted to the court pursuant to Md. Rule 9–203(f).

| Period in question | MR. DIGGES: potential income | MRS. DIGGES: actual earned income |
|---|---|---|
| 10/94 - 9/31/95 | $85,000 | $10,500 |
| 10/95 - 9/31/96 | $85,000 | $13,500 |
| 10/96 - 9/31/97 | $100,000 | $24,100 |
| 10/97 - 9/31/98 | $125,000 | $30,100 (projected) |
| 10/98 - 9/31/99 | $150,000 | $30,100 (projected) |

Because the court used a progressive scale to calculate appellant's potential income, his child support obligation varied from year to year. The child support also fluctuated because the court took into account that Ashley would turn eighteen in October 1997, that John would turn eighteen in May 1999, and that Brittany would reach her majority in September 2000. The court again utilized a chart to set out its ruling:

| PERIOD | AMOUNT OF CHILD SUPPORT | REASON FOR CHANGE |
|---|---|---|
| 10/31/94 – 10/30/95 | $1180.63/month or $14,167.56/year | |
| 10/31/95 – 10/30/96 | $1247.37/month or **$14,968.44**/year | Mrs. Digges's income increased to $13,500 and the amount of alimony decreased to $1625/month |
| 10/31/96 – 8/27/97 | $1542.19/month or **$15,421.90** (10 months) | Mrs. Digges's income increased to $24,100, her alimony decreased to $741.67/month, and Mr. Digges's potential income increased to $100,000. |
| 8/28/97 – 10/30/97 | $1230.09/month or **$3,690.27** (3 months) | Ashley turned eighteen. |
| 10/31/97 – 10/30/98 | $1247.59/month or $14,971.08 + augmented amount of $3,742.77/year for a combined monthly total o $1.559.49 and a yearly total of **$18,713.85** | Mrs. Digges's income increased to $30,100 and Mr. Digges's potential income increased to $125,000 so that the combined incomes exceed the maximum guideline range by 25%. |
| 10/31/98 – 5/17/99 | $1266.06/month or $8,862.42 (7 months) + augmented amount of $633.03/month or $4.431.21 (7 months) for a combined monthly total of $1,899.09 and a 7 month total of **$13,293.63.** | Mr. Digges's potential income increased to $150,000 so that the combined incomes exceed the maximum guideline range by 50%. |
| 5/18/99 – 9/19/2000 | $814.79/month or $13,036.64 (16 months) + augmented amount of $407.40/month for a combined monthly total of $1,222.19 and a 16 month total of **$19,555.04.** | John Bradford turns eighteen. |

With regard to alimony, the court found that "an award of alimony for an indefinite period of time is proper in this case." The court stated:

Mrs. Digges has made as much progress toward become self-supporting as can reasonably be expected given her medical condition and her current educational background. She can only increase her income by obtaining a Master's Degree in Education. Yet even if she does obtain a graduate degree, testimony revealed that her yearly earnings will only increase by approximately $5,000. That increase would place her estimated yearly earnings between $30,000 to $35,000. Mr. Digges [sic] maximum earning potential beginning in 1999 is $150,000 or five times as much. The

respective standards of living of the parties will be unconscionably disparate.

Another chart distilled the court's ruling as to alimony:

| YEAR | ALIMONY AWARD (needs - income) | AMOUNT ACTUALLY PAID | ARREARAGE |
|---|---|---|---|
| 10/31/94 - 10/30/95 | $22,500/year ($33,000 - $10,500) or $1875/month | $750 (tax return) $9900 (rent) $825 (car expenses) $3471.62 (h. ins.) $14,946.62 | $7,553.38 |
| 10/95 - 10/96 | $19,500/year ($33,000 - $13,500) or $1625/month | $4875 (tax return) | $14,625.00 |
| | $8,900/year ($33,000 - $24,100) or $741.67/month | $0.00 | $8,900 |
| | $8,900 ($39,000 - $30,100) or $741.67/month | n/a | n/a |

Additionally, the court awarded Ms. Digges $76,000 in attorney's fees, which represented ⅘ of the $99,102.93 appellee claimed she had incurred. The attorney's fees were to be paid in monthly installments of $1,000.00.

In sum, then, appellant was ordered to pay: 1) child support according to the graduated chart that appears on page 17 of this opinion, as well as arrears of $15,619.33; 2) indefinite alimony of $1,875 per month from October 31, 1994 through October 31, 1995; $1,625 per month from October 31, 1995 through October 30, 1996; $741.67 per month thereafter; and arrears of $31,078.38; 3) attorney's fees and expenses of $76,000, and interest commencing from the date of the order; and 4) all open court costs.

We will include additional facts in our discussion of the issues.

### Discussion

### I. The "Scarlet Letter" of Voluntary Impoverishment

Appellant contends that, on remand, the court erred in "perpetuating" a "scarlet letter" of voluntary impoverishment,

ignoring the "dynamic", "fluid", and "evolving" circumstances that occurred following the original trial. Asserting his "scarlet letter" argument with respect to the awards of alimony, child support, and counsel's fees, appellant asks:

[I]s a conclusion of "voluntary impoverishment" relative to a certain timeframe [sic] to be a "branding" that becomes inescapable even though economic circumstances change and evolve into more crystal-like terms so as to ease the mechanical application process for purposes of child and spousal support?

In particular, appellant argues that the trial court erred "in not utilizing ... evidence ... of 'actual earnings' as a basis for spousal 'rehabilitative' support and child support findings." He contends that the court's determination of potential income works an "injustice," because it defies "the reality of [his] available resources." In appellant's view, the issue of potential earnings "had become no longer relevant due to intervening economic developments." Thus, Mr. Digges complains that the trial court "proceeded statically as though despite the passage of time its primary obligation pursuant to this Court's earlier decision was to simply perform 'a re-evaluation of Mr. Digges's potential income.' "

According to appellant, the combined alimony and child support payments "nearly equal [his] disposable 'actual' earnings without regard for his having to underwrite his own living expenses." Concerning the period between October 1994 and October 1997, appellant alleges that the court's order fails to reflect an "income shares" model. Instead, he argues that he has been saddled with a disproportionate share of the burden. With regard to the period between October 1997 and September 2000, appellant avers that modification of an award for prospective purposes may only be achieved by a Motion for Modification, pursuant to F.L. § 12–104. Finally, appellant contends that the court erred in considering the resources of appellant's extended family in awarding counsel's fees. Appellant's many claims are unavailing. We explain.

██ At the outset, we reject any suggestion by appellant that the trial court was obligated to revisit the issue of voluntary impoverishment on remand. To the contrary, we resolved that issue in *Digges I.*

In *Goldberger v. Goldberger,* 96 Md.App. 313, 327, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993), we said that "a parent shall be considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources." *Goldberger* also outlined the factors to be considered in determining whether a parent has become voluntarily impoverished. They are:

1. his or her current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other considerations presented by either party.

*Id.* at 327, 624 A.2d 1328 (quoting *John O. v. Jane O.,* 90 Md.App. 406, 422, 601 A.2d 149 (1992)); *see Moore v. Tseronis,* 106 Md.App. 275, 282–83, 664 A.2d 427 (1995).

██ Appellant also quarrels with the court's reliance on his "potential" income. Once a court determines that a parent has become voluntarily impoverished, the court must determine the party's potential income. *Goldberger,* 96 Md.App. at 327, 624 A.2d 1328; *see Wills v. Jones,* 340 Md. 480, 490, 667 A.2d 331 (1995); *Wagner v. Wagner,* 109 Md.App. 1, 42–43, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996);

*Reuter v. Reuter,* 102 Md.App. 212, 221, 649 A.2d 24 (1994). Accordingly, in *Digges I,* upon affirming the court's predicate finding that appellant had voluntarily impoverished himself, we ordered a "re-evaluation of Digges's *potential* income" and a "re-determination of the appropriate level of child support based upon the guidelines." *Digges I,* slip op. at 14. Therefore, we perceive no error in the court's failure to base its alimony and child support awards on appellant's "actual" income.[6]

Section 12–201(b) of the Family Law article defines "income" as:

(1) actual income of a parent, if the parent is employed to full capacity; or

(2) *potential income of a parent,* if the parent is voluntarily impoverished.

(Emphasis added). Further, F.L. § 12–201(f), provides:

*Potential income.*— "Potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

In determining a party's potential income, *Goldberger* instructs the trial court to consider the following factors:

1. age
2. mental and physical condition
3. assets

---

**6.** Appellant contends that, on remand, *Lemley v. Lemley,* 102 Md.App. 266, 649 A.2d 1119 (1994), compelled a calculation of appellant's "actual" income. We disagree. The portion of *Lemley* cited by appellant concerned whether a trial court may "gross-up" a parent's tax-free disability income so as to put the parent on equal footing with other parents who pay income tax. *Lemley* sheds no light on the issue presented in appellant's case. Indeed, we acknowledged in *Lemley* that voluntary impoverishment was an exception to the general rule that "the guidelines do not permit the use of any figures other than the 'actual income' of each parent as defined in FL § 12–201(c)." *Id.* at 290, 649 A.2d 1119.

4. educational background, special training or skills

5. prior earnings

6. efforts to find and retain employment

7. the status of the job market in the area where the parent lives

8. actual income from any source

9. any other factor bearing on the parent's ability to obtain funds for child support.

*Goldberger,* 96 Md.App. at 328, 624 A.2d 1328.

Although it was not required to do so, the trial court, on remand, carefully re-examined the evidence of voluntarily impoverishment, again discussing each of the factors set forth in *Goldberger.* The court concluded that the "scarlet letter" of which appellant now complains continued to be well deserved, as Mr. Digges had yet to take the steps necessary to achieve an income approaching his abilities. Significantly, much of the court's analysis focused on appellant's conduct in the time between the first trial and the remand. The court noted, for example, that at the time of the remand hearing, appellant drove a leased 1997 Honda Accord and shared the rent of his Timonium condominium with Katharine Kerr, his girlfriend. She testified that she spends approximately three nights per week at the condominium and contributes $875.00 of the $1375.00 monthly rent. Additionally, appellant maintained his memberships in the Mid–Ocean Club in Bermuda and the Princeton Club in New York. Further, at the time of the remand hearing, appellant performed consulting work for Corcom. The court observed, however, that his position there "evolved" out of casual conversation with social friends; appellant never even prepared a *curriculum vitae.* Moreover, the court discounted appellant's claim that he was spending his time pursuing a graduate degree. Although appellant was enrolled in a "Flex Program designed for working adults", he had completed only eight credits toward his MBA since 1993.

■ Without question, these findings belie appellant's claim that the court approached the voluntary impoverishment in a "static" way, or failed to examine events that occurred subse-

quent to the initial trial. Moreover, we see no "intervening economic developments" that undermined the court's finding as to voluntary impoverishment. Nor did the court err in its award of "prospective" child support for the period between November 1997 and September 2000. The court's task on remand was to make a "re-determination of the appropriate level of child support based on the guidelines." *Digges I,* slip op. at 14. Because the ruling did not constitute a "prospective modification" of child support, appellant's reliance on *Haught v. Grieashamer,* 64 Md.App. 605, 497 A.2d 1182 (1985), is misplaced.

■ We are also unpersuaded that the court erred in considering appellant's potential income in awarding attorney's fees. In our earlier opinion, we determined that the court made a factual error in concluding that appellant had an immediate potential income of $100,000. Citing *Doser v. Doser,* 106 Md.App. 329, 335 n. 1, 664 A.2d 453 (1995), we observed that when an appellate court vacates an award for alimony or child support, it "often vacate[s] the remaining awards for evaluation," including an award of attorney's fees. *Digges I,* slip. op. at 17.

Family Law § 11–110(b) provides that a court "may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding." But, F.L. § 11–110(c) requires that, before making such an award, the court "shall consider:"

(1) the financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting or defending the proceeding.

Ms. Digges requested the court to order attorney's fees in her behalf for the cost of her defense of the original divorce action, a contempt hearing related to appellant's failure to pay child support, and for the appeal and remanded proceedings. Appellee claimed that she incurred legal fees in the amount of $99,102.93. Addressing the factors set forth in F.L. § 11–110(c), the court stated:

The financial resources and financial needs of both parties have been discussed at length throughout this opinion. Mrs. Digges's financial resources are limited while Mr. Digges is capable of earning a large income *while enjoying substantial resources from his extended family.* Mrs. Digges's needs are great at this time, while Mr. Digges's financial needs are being met.

The Court of Special Appeals determined that there was substantial justification for prosecuting or defending the original proceeding. Additionally, this Court finds substantial justification for prosecuting the contempt hearing and the present action. Therefore, the Court finds it reasonable and proper for Mr. Digges to pay a portion of Mrs. Digges's counsel fees and costs of litigation under the facts of this case and in consideration of the various awards which are to be made.

The Court will order Mr. Digges to pay four-fifths of Mrs. Digges's counsel fees and expenses of litigation.

(Emphasis added).

In our view, the trial court's ruling also conformed to our instructions in *Digges I* with respect to family gifts. There, we made it clear that, on remand, the court could consider any "gifts" that appellant might receive from his family. We said:

> The trial court on remand should consider the *total financial resources* and conditions of both parties. *The court may, in its discretion, place a cash-value on the "gifts" received by Digges and use that determination in considering the first factor of section 11–110(b). See Petrini, supra,* 336 Md. at 467, 648 A.2d 1016. The court is also free to consider, in its discretion, all aspects of appellant's current situation, including his lifestyle *and ability to earn income in the future,* as well as his current debts.

*Digges I,* slip op. at 18.

In sum, we conclude that what appellant describes as a "scarlet letter" was nothing more than a faithful application by the lower court of the mandate of this Court. In light of

appellant's voluntary impoverishment, we perceive neither error nor abuse of discretion in the court's ruling on remand as it related to the calculation and application of appellant's potential income.

## II. Indefinite alimony

■ Appellant next contends that the court abused its discretion in awarding Ms. Digges permanent, rather than temporary, alimony. We disagree.

When reviewing a trial court's award of alimony, an appellate court will not reverse the judgment unless it concludes that "the trial court abused its discretion or rendered a judgment that was clearly wrong." *Crabill v. Crabill,* 119 Md.App. 249, 260, 704 A.2d 532 (1998); *see Tracey v. Tracey,* 328 Md. 380, 388, 614 A.2d 590 (1992); *Brodak v. Brodak,* 294 Md. 10, 28–29, 447 A.2d 847 (1982). "[A]ppellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." *Tracey,* 328 Md. at 385, 614 A.2d 590.

The amount and duration of alimony is governed by F.L. § 11–106. In *Tracey,* 328 Md. 380, 614 A.2d 590, the Court of Appeals made clear that the "purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently." *Id.* at 391, 614 A.2d 590 (citing the report of the Governor's Commission on Domestic Relations Laws(1980)). It is clear, therefore, that under F.L. § 11–106, the "policy of this State is to limit alimony, where appropriate, to a definite term in order to provide each party with an incentive to become fully self-supporting." *Jensen v. Jensen,* 103 Md.App. 678, 692, 654 A.2d 914 (1995); *see Rock v. Rock,* 86 Md.App. 598, 608, 587 A.2d 1133 (1991); *Blake v. Blake,* 81 Md.App. 712, 727, 569 A.2d 724 (1990); *Rogers v. Rogers,* 80 Md.App. 575, 591, 565 A.2d 361 (1989); *Thomasian v. Thomasian,* 79 Md.App. 188, 194–95, 556 A.2d 675 (1989); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75, 502 A.2d 1068 (1986); *Holston v. Holston,*

58 Md.App. 308, 321, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984).

Despite Maryland's preference for rehabilitative alimony, F.L. § 11–106 continues to permit the court to award indefinite alimony in appropriate cases. F.L. § 11–106(c) states:

*Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

In making an award of alimony, the trial court is required to consider all of the factors set forth in F.L. § 11–106(b). *Doser,* 106 Md.App. at 355, 664 A.2d 453. To be sure, the court "need not use formulaic language or articulate every reason for its decision with respect to each factor. Rather, the court must clearly indicate that it has considered all the factors." *Id.* at 356, 664 A.2d 453 (citations omitted). If the court fails to make clear that it has considered all of the factors, then the record, as a whole, must reveal that the court's findings were based on a review of the statutory factors. *Id.*

According to Mr. Digges, the court erred in awarding indefinite alimony because, by the time of the remand, appellee "ha[d] progressed through the essentially rehabilitative periods and ha[d] become once again self-supporting in her chosen profession." Appellant points out that Ms. Digges secured a full-time teaching position two-and-a-half years after the divorce decree, whereas the trial court surmised in its original opinion that it would take her four years to become self-supporting. Moreover, appellant disputes that the parties' living standards would be "unconscionably disparate", even if he were able to earn his "potential" salary. Appellant claims:

Within the context of 1998, an actual Schedule C income of ±$42,500 (Appellant's projected) is not unconscionably disparate with an actual income of ±$32,500 (Appellee's projected); or, as to 1997, an actual Schedule C income of ±$37,500 (Appellant's) is not unconscionably disparate with actual income of ± $30,000 (Appellee's).

We find no error or abuse of discretion. Preliminarily, we note that the income figures quoted above by appellant ignore the court's finding that appellant's "actual" income was the result of voluntary impoverishment.[7] Moreover, the question of whether potential income may be used to calculate alimony was decided in *Digges I*. Therefore, it is the law of the case. In our previous opinion, we stated:

> Based on the plain meaning of the words used by the General Assembly in section 11–106(b)(9), the court on remand should consider the ability of appellant to meet his own needs as well as those of his former spouse. *When considering this ability, the court is entitled to consider not only what Digges earns but what he could earn if he fully applied himself.*

Slip op. at 16 (emphasis added). Thus, appellant's potential income was an important focus of the court's analysis as to the disparity in the parties' standards of living. After evaluating each of the factors enumerated in F.L. § 11–106(b), the trial court was entitled to find, from the evidence, an unconscionable disparity, based on appellant's potential income in excess of $100,000, as compared to appellee's projected income of $30,100.

To be sure, a "formerly dependent spouse ordinarily is not entitled to have his or her standard of living 'keep pace' with

---

**7.** Appellant does not identify a source for his assertion that his "projected" 1998 income will be "±$42,500." In his brief, appellant asserts that his "gross earnings for 1998 are at an approximate $60,000.00 pace." In a financial statement filed with the court, Mr. Digges claimed that his gross monthly income from "consulting assignments" as of September 11, 1997 was $4,125.00, or $49,500 per year. In addition, we note that Ms. Digges's projected 1998 income was $30,-100, not "±$32,500."

that of the other spouse after the divorce, or to share in the other spouse's future accumulations of wealth." *Blaine v. Blaine,* 336 Md. 49, 70, 646 A.2d 413 (1994); *see Cole v. Cole,* 44 Md.App. 435, 443, 409 A.2d 734 (1979). Nevertheless, *Blaine* also affirmed that "the provisions of indefinite alimony serve as a restraint upon the doctrine of rehabilitative alimony, protecting the formerly dependent, and less financially secure, spouse from too harsh an existence after the divorce." *Blaine,* 336 Md. at 70, 646 A.2d 413. Here, although appellee had achieved some degree of self-sufficiency, her standard of living will remain perpetually inferior to that of Mr. Digges. The court noted that even if Ms. Digges obtains a master's degree, her income will only rise by about $5,000. Appellant's potential income exceeded appellee's by a factor of five.

We do not suggest that any gap in the parties' incomes would automatically entitle Ms. Digges to indefinite alimony. *See Tracey,* 328 Md. at 393, 614 A.2d 590 (declining to adopt a "hard and fast rule" regarding any disparity between the incomes of parties contesting indefinite alimony). But, numerous Maryland cases demonstrate that income disparities of the magnitude present in this case may form the basis for indefinite alimony. In *Caldwell v. Caldwell,* 103 Md.App. 452, 463–64, 653 A.2d 994 (1995), we affirmed an award of indefinite alimony on the ground that the parties' standard of living was unconscionably disparate when the party seeking alimony earned 43% of her spouse's after-divorce income. Similarly, in *Broseus v. Broseus,* 82 Md.App. 183, 195–97, 570 A.2d 874 (1990), we held that a court did not abuse its discretion in awarding indefinite alimony to a homemaker who, after nineteen years of marriage, returned to the work force with an annual salary of $19,674. The party seeking alimony held a bachelor's degree in "medical sciences," but had not been employed outside the home during most of the parties' marriage. Her husband's salary at the time of trial was $56,-411.52 per year. Likewise, in *Bricker v. Bricker,* 78 Md.App. 570, 577, 554 A.2d 444 (1989), we upheld indefinite alimony when the party seeking it earned 35% of her husband's salary. *Accord Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d

1208 (1983)(affirming indefinite alimony when spouse earned 34% of her husband's annual income).

Other factors enumerated in F.L. § 11–106(b) may also have undergirded the court's ruling. For instance, the court was entitled to consider the "contributions, monetary and nonmonetary, of each party to the well-being of the family", and the "circumstances that contributed to the estrangement of the parties." F.L. § 11–106(b)(5),(6). By his own admission, appellant's conduct has been "the root of the family's economic devastation." By any measure, that devastation has been catastrophic. Ms. Digges and the children have endured the transition from Hinchingham to a cramped Chestertown apartment, as well as a substantial decline in income, from as much as three-quarters of a million dollars to an annual income of just over thirty thousand dollars. It is also noteworthy that, after the birth of the parties' children, Ms. Digges was the proverbial "stay at home mom." Appellant's meteoric rise in the legal profession would arguably not have been possible without her non-monetary contributions to the "well-being of the family". Thus, the court was entitled to conclude that in the wake of appellant's equally meteoric fall, appellee should not be left to suffer the burden of the family's precipitous economic decline.

In this regard, *Holston v. Holston*, 58 Md.App. 308, 473 A.2d 459 (1984), is instructive. There, the parties had been married 15 years at the time of separation and were only 39 years of age at the time of trial. When the wife was a college student, she left school to marry, and took a job so that her husband could pursue his education to become a dentist. On appeal, the wife challenged the award of rehabilitative alimony, contending that the court should have awarded indefinite alimony. We recognized that the wife would encounter difficulty obtaining an education and acquiring marketable skills because of the "necessity [for the wife] to provide and care for five minor children." *Holston*, 58 Md.App. at 323, 473 A.2d 459. Because the wife had contributed substantially to the husband's career, was not at fault in the divorce, and there was no doubt that the standards of living would be unconscio-

nably disparate even if the wife obtained employment, we found that the court abused its discretion in failing to award indefinite alimony.

We are mindful that all but one of the parties' children have now reached the age of majority. Nevertheless, in view of the "great deference" we accord "to the findings and judgments of trial judges, sitting in their equitable capacity," *Tracey,* 328 Md. at 385, 614 A.2d 590, we perceive no error in the court's award of indefinite alimony.

### III. Cross–Appeal

In her cross-appeal, Ms. Digges contests one aspect of the court's ruling. She asserts that the court erred when, in determining her projected income for purposes of alimony, it included the $240.00 per month she earned from tutoring. Ms. Digges complains that she "has been forced to tutor students in the late afternoons, evenings, and on Saturdays to pay basic necessities", in part because of appellant's failure to pay child support and alimony during the pending litigation. Ms. Digges contends that the court's consideration of her part-time earnings is "contrary to the legislative intent of an equitable, fair, and just award of alimony." In his reply brief, appellant responds with a two-sentence retort:

FL § 12–201(c)[1] defines "actual income" as meaning "income from any source." Accordingly, the trial court did not err in this particular redetermination on remand.

Contrary to appellant's assertion, the Court of Appeals has made clear that the use of the phrase "all income" in F.L. 11–106(b)(11)(i) does not require a court to include income from part time employment in calculating an alimony award. In *Tracey, supra,* 328 Md. 380, 614 A.2d 590, the Court upheld a trial judge's *exclusion* of part-time income, stating that "income" as it is used in that section means "wages or salary from *regular, full-time employment,* i.e., money earned during the normal work week as is appropriate to a given occupation." *Id.* at 389, 614 A.2d 590 (Emphasis added). In that case, the court awarded indefinite alimony to a woman who, after twenty-six years of marriage, earned $15,381.88 as a full-

time civilian payroll technician for the federal government, compared to her spouse's income of $57,973.25 as a supervisor for a utility company. *Id.* at 382–83, 614 A.2d 590. At the time of the divorce, Ms. Tracey supplemented her income with money from a part-time job at a fast food restaurant. In calculating the alimony award, the trial court excluded the part-time earnings, stating:

> I believe that one is not required to work two jobs. Neither of them during their lifetime[s] had two jobs of employment. They each had one job. . . . And one does not have to work all the hours she does. . . .

*Id.* at 383, 614 A.2d 590.

On appeal, Mr. Tracey contended that the phrase "all income" in F.L. § 11–106(b)(11)(i) required the court to include Ms. Tracey's part-time income in its calculation. The Court of Appeals disagreed. In its view, the "paramount goal" of the alimony provisions of the family law article was "to create a statutory mechanism leading to equitably sound alimony determinations by judges." *Id.* at 388, 614 A.2d 590. A literal reading of "all income" would hamper the efforts of trial judges to arrive at a "just" alimony award. *Id.* at 388–89, 614 A.2d 590. The Court noted that "[p]art time work is often tenuous in prospect and short in duration. To include such income as a matter of course may ultimately result in a false picture of a party's economic self-sufficiency or security." *Id.* The Court said:

> For a payroll clerk like [Ms. Tracey], thirty-five to forty hours per week is undoubtedly the norm. The trial court found [Ms. Tracey's] second, part-time job at McDonald's to be temporary work, in the nature of a stop-gap, filling the interim between the Traceys' final separation and the resolution of their financial affairs attendant upon divorce. [Ms. Tracey] worked at McDonald's as many as twenty or twenty-five additional hours each week. Her work week of sixty to sixty-five hours can only be described as burdensome. . . .

The alimony statute does not consign [Ms. Tracey] to an existence of unremitting toil.

*Id.* at 389–90, 614 A.2d 590.

Accordingly, we reject the notion that the trial court was required to include appellee's part-time income in its alimony calculation. On the other hand, *Tracey* does not *prohibit* the court from including part-time wages as "income". To the contrary, the *Tracey* Court merely rejected "an approach based on rote or formula" in favor of one compatible with the Legislature's "stated aim of judicial flexibility...." *Id.* at 389, 614 A.2d 590.

We agree with Ms. Digges that she "should not be punished for her work ethic nor commuted to a life of drudgery simply because she has shouldered a disproportionate share of the responsibility of providing for the Digges children." In our view, however, the court's award of $741.67 per month of indefinite alimony beginning in October 1996, in addition to $42,000 in alimony for the period between October 31, 1994 through October 30, 1996, is an adequate award. Viewed as a whole, the court's award reflects a careful consideration of appellant's total income, including the money she earns from tutoring. The court apparently determined that it is reasonable for a teacher to supplement her income in this way, particularly when there are no young children in the home, and the total number of hours required for both jobs does not seem too onerous. In short, it was within the trial court's discretion to tailor a "just" award.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID 90% BY APPELLANT/CROSS–APPELLEE, 10% BY APPELLEE/CROSS–APPELLANT.**