838 A.2d 1247

**John A. GOSHORN**

v.

**Edna D. GOSHORN.**

**No. 01424, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 19, 2003.

Patrick R. Hudson, Waldorf, for appellant.

William C. Fanning, Jr. (Devine & Fanning, P.A., on brief), La Plata, for appellee.

Argued before EYLER, JAMES R., KRAUSER, JOHN J. BISHOP, JR. (Retired, specially assigned), JJ.

KRAUSER, J.

The Circuit Court for Calvert County granted appellant, John A. Goshorn, a judgment of absolute divorce from appellee, Edna D. Goshorn and then, in words that are to play a key role in this appeal, "ordered that all other issues, including child support, custody and marital property have been reserved and set for a future date before the Honorable Warren J. Krug in this Court." No specific juristic mention was made of alimony. When, a year later, the circuit court awarded

Mrs. Goshorn indefinite alimony, that omission would create this appeal's first issue: was alimony one of the "other issues" reserved for "a future date"?

The second issue is a little more prosaic. It asks us to determine whether the circuit court misapplied the twelve factor test of Md.Code (1984, 1999 Repl.Vol.), § 11–106(b) of the Family Law Article ("FL") in awarding Mrs. Goshorn indefinite alimony. While the second issue is almost routine in cases such as this, the third issue is not. It takes us into less familiar territory and asks that we consider the duty of a noncustodial parent (in this instance, Mrs. Goshorn) to support a handicapped adult child, specifically, one who is not self-supporting but who is presently receiving Social Security Income ("SSI") benefits until she reaches the age of twenty-one. The handicapped adult child at issue here is Sarah, the oldest of the parties' three children. After awarding custody of the two other children to Mr. Goshorn and finding, by agreement of the parties, that the eighteen year old Sarah was a "destitute adult child" under FL §§ 13–101(b), the circuit court did not include her in calculating Mrs. Goshorn's child support obligation because Sarah was temporarily receiving SSI assistance.

Claiming error, Mr. Goshorn challenges the jurisdiction of the circuit court to belatedly award indefinite alimony to Mrs. Goshorn, the circuit court's application of the twelve factor alimony test, and the exclusion of the parties' adult child by that same court from Mrs. Goshorn's child support obligation. We can only grant him partial relief.

The circuit court, we hold, did have jurisdiction to make an award of indefinite alimony to Mrs Goshorn. Nonetheless, we shall vacate that award because of a judicial error made in calculating Mr. Goshorn's income. A vacation of an alimony award requires a vacation of any concomitant monetary award because the two must be considered in tandem. Consequently, we shall also vacate Mrs. Goshorn's monetary award so

that the court may make any adjustment in alimony or to that award it deems appropriate.

Furthermore, we shall vacate the circuit court's child support award, as it was calculated without considering that Sarah may be without any SSI assistance once she reaches the age of twenty-one. The record and the briefs suggest that the SSI benefits are only temporary, and counsel was unable to clarify, during argument before this Court, whether Sarah will still be eligible for those or other benefits once she turns twenty-one. There is, moreover, no basis in the record for the court to conclude that Sarah's SSI benefits provide her with an appropriate level of support.

## Background

The parties had been married for twenty years when they separated in June 2000. During their marriage, they had three children: Sarah, born on July 28, 1983; John Jr., born on August 5, 1988; and Zachary, born on May 21, 1992. Sarah, the oldest child, was born with Down's Syndrome. Although now an adult, Sarah functions at the level of a three or four year old, and the parties agree that she cannot support herself. Because of her disability, Sarah receives $545 per month in SSI benefits; those payments apparently cease when she turns twenty-one.

Mr. Goshorn, an employee of the United States Bureau of the Census for over thirty years, was the primary breadwinner of the family, while Mrs. Goshorn devoted herself, for the most part, to the care of the parties' children. In fact, Mrs. Goshorn stopped working shortly after Sarah's birth. Three years after that, Mrs. Goshorn obtained a daycare license that permitted her to operate a small daycare business out of the family home,[1] which she did for approximately ten years. The daycare business allowed Mrs. Goshorn to stay at home and raise the children, while providing additional income for the

---

1. Ms. Goshorn was licensed to care for up to six children, but the record does not indicate how many children she actually cared for.

family. With the problems that Sarah faced, the arrangement "worked out pretty fair," observed Mr. Goshorn.

After her daycare business ended,[2] Mrs. Goshorn went to work for the Kmart Corporation part-time and for the Calvert County School System as a part-time cook. Eventually, she left both jobs to work full-time as a cook for the Prince George's County School System, the position she currently holds. As a full-time cook, Mrs. Goshorn earns $9.36 an hour and works thirty hours a week. Although she works only thirty hours a week, the circuit court, without objection from Mrs. Goshorn, imputed forty hours of work a week to Mrs. Goshorn and, based on that number of hours, concluded that she earned $1622.40 per month.

Making further professional advancement problematic, Mrs. Goshorn reads at a third grade level and, as her testimony disclosed, she had great difficulty in understanding and preparing a financial statement for the divorce proceedings. Given "Mrs. Goshorn's education and her skills," the circuit court concluded, "it is impossible for her to be wholly self-supporting . . . ."

In June 2000, Mrs. Goshorn took the children and left the marital home to move in with her sister in St. Mary's County. There, she lived with her children, her sister, and her brother-in-law in a house that was partly owned by a Mr. James Boswell. At some point a relationship between Mr. Boswell and appellee developed because, at the time of the divorce proceedings, the two were living together. That living arrangement apparently began when Boswell moved into the St. Mary's house in November 2000. Several months later, Mr. Boswell and Mrs. Goshorn moved to Lusby, Maryland, where they rented a three bedroom home and shared expenses.

---

**2.** There is some dispute as to why Mrs. Goshorn is no longer a licensed daycare provider. Mrs. Goshorn testified that she let her license lapse at the insistence of Mr. Goshorn because he was "afraid [they] would get sued." But Mr. Goshorn testified that Mrs. Goshorn quit the daycare business because her daycare parents no longer needed her services.

## Procedural History

On July 21, 2000, Mr. Goshorn filed a complaint for absolute divorce in the Circuit Court for Calvert County seeking principally a divorce, custody of the parties' children, and child support.[3] A year later, on August 9, 2001, Mrs. Goshorn responded by filing a counterclaim, seeking a divorce, custody of the two minor children (Sarah having by now reached adulthood), child support, and permanent alimony. Before the counterclaim was filed, however, a custody hearing was held on February 18, 2001. Seven months after that, the circuit court issued an order, granting the parties joint custody of the minor children, but awarding Mr. Goshorn primary "physical and residential custody" of all three children on a *pendente lite* basis.[4]

On August 16, 2001, the parties appeared before a domestic relations master solely on the issue of the divorce. At the conclusion of that hearing, the master stated he was "satisfied that there's been sufficient evidence produced to grant [Mr. Goshorn] an actual divorce from his wife, Edna Goshorn." The next day, the Circuit Court for Calvert County granted Mr. Goshorn a judgment of absolute divorce. In doing so, it stated "that all other issues, including child support, custody and marital property have been reserved and set for a future date before the Honorable Warren J. Krug in this Court. . . ."

A hearing on the issues reserved began on January 23, 2002, and continued on April 18, 2002. On the first day of what was, despite its conclusion three months later, only a two-day hearing, Mr. Goshorn's counsel moved to prohibit any testimony relating to alimony on the ground that the divorce decree

---

3. In that complaint, Mr. Goshorn also requested a reasonable sum for household expenses, exclusive use and possession of the family home, a declaration that the furniture and furnishings in the family home are family use personal property, and an order allowing Mr. Goshorn to claim the three minor children as exemptions on his taxes.

4. The court's order included Sarah, but she had, by that point, reached the age of majority. The order was issued on September 18, 2001, and Sarah turned eighteen in July of that year.

"did not reserve alimony specifically." Disagreeing, Mrs. Goshorn's attorney asserted that he had raised the issue during the divorce hearing, that opposing counsel had orally assured him that it was preserved, and that the court's divorce decree reserved "all other issues." After hearing from both sides, the court ruled that it was "reserv[ing] on the alimony issue," but would permit Mrs. Goshorn to testify about matters relevant to that issue.

When that hearing concluded three months later, the circuit court awarded Mrs. Goshorn indefinite alimony in the amount of $1,500 a month. In doing so, it stated:

Okay. Let me address the issue of alimony first. In looking at the factors in 11.106, the Court has to consider the twelve factors that are listed in that section: the ability of the party seeking alimony to be wholly or partly self-supporting. I think in view of Mrs. Goshorn's education and her skills that is impossible for her to be wholly self-supporting and it would be very difficult for her—she can partly self-support herself, but I think not to the extent that she can fully self-support herself.

The time necessary for her to gain sufficient education and training to enable the party to find suitable employment, I don't think that would be possible in light of her education and her skills.

The standard of living the parties have established. I agree they've established a middle income or a fairly reasonable standard of living. Nothing outlandish. Nothing—I think it's a fairly modest standard of living.

Duration of the marriage. The parties were married about twenty years, twenty-one years.

Contributions, monetary and non-monetary of each party to the well-being of the family. I think they both contributed. Mr. Goshorn was the primary breadwinner. Mrs. Goshorn was home raising the children, caring for them. Also did some—had some income.

Circumstances that contributed to the estrangement of the parties. I think that's a fairly neutral factor. I think

these parties just grew apart. Mrs. Goshorn testified that Mr. Goshorn was controlling and that was something that was not acceptable to her, and I think they finally grew apart.

Age of the parties. There is a few years age difference. I think, what, eight or nine years difference in the ages. Somewhere around that.

Physical and mental condition of each party. Both parties seem to be physically in good shape and mentally in good shape except that Mr. Goshorn's—excuse me. Mrs. Goshorn's abilities are not up to the extent that Mr. Goshorn's are and I think never will be.

The ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony. I think—certainly I think Mr. Goshorn has the ability to meet his needs while meeting Mrs. Goshorn's—or while meeting the needs of Mrs. Goshorn.

There is no agreement between the parties.

Financial needs and financial resources of each party, including income and assets, including property [that] does not produce income. Clearly Mr. Goshorn has much more in this way. Any award under 8–205 and 8–208—I need to make sure I got those correct. 8–205 is a monetary award, which I'll come to in a few minutes. And 8–202 is use and possession. I'll come to both of those in just a minute.

The nature and amount of the financial obligations of each party. I don't think we've had much testimony or significant testimony. Obviously, there is a mortgage on the house and I don't believe there is any significant amount otherwise.

Right of each party to receive retirement benefits. Mrs. Goshorn has just started getting a—being covered under a retirement plan. Mr. Goshorn has twenty plus years of Federal service where he has—has the right to receive those retirement benefits.

And I don't think factor twelve applies.

The other issue to look at is the issue of whether this should be rehabilitative alimony or indefinite alimony. The law favors rehabilitative alimony, but the factors to be considered are the ability of the party seeking alimony to be wholly or partly self-supporting, and the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment.

I don't think Mrs. Goshorn will ever get to the point where she is able to earn income that—or, excuse me, find a job that would permit her to earn an income that would fully support herself or that would be—it would be suitable employment.

So based on that I find that there is, in fact, a basis for an award of indefinite alimony.

The court continued:

All right. Let me get back to the alimony. This is a case in which we have two individuals whose income is truly disparate. Mr. Goshorn's income is almost Seven Thousand Dollars a month. Mrs. Goshorn, if she worked forty hours a week, would be Sixteen Hundred and Twenty–Two Dollars and Forty cents per month.

Based on all of this, I am going to order that Mrs. Goshorn receive indefinite alimony in the amount of One Thousand Five Hundred Dollars per month.

In sum, the court found that "in view of [Mrs. Goshorn's] education and her skills" it would not be possible "for her to be wholly self supporting" or "to gain sufficient education and training to enable [her] to find suitable employment." It further concluded that the parties' respective incomes were "truly disparate." And, based on these findings, the court ordered Mr. Goshorn to pay Mrs. Goshorn $1,500 a month in indefinite alimony.

In the written order that followed, the court also awarded Mrs. Goshorn 50% of the marital portion of Mr. Goshorn's retirement pension on an as, if, and when basis; the right to elect to receive a survivor annuity in Mr. Goshorn's retirement pension; a one-third interest in Mr. Goshorn's thrift savings

plan; and, "if jointly-titled, half of the proceeds of the sale of the family home after the expiration of any use and possession order."

The order further awarded Mr. Goshorn sole legal and physical custody of the two minor children, John and Zachary, and granted Mr. Goshorn use and possession of the family home until July 1, 2004. Although the court found, as the parties agreed, that the now eighteen-year-old Sarah was a "destitute adult child," it excluded her in calculating Mrs. Goshorn's child support obligation. The court explained its actions, by stating that Sarah is "currently receiving Social Security income benefits and is therefore considered self supportive...."

After the hearing, but before the written order was issued, counsel for Mr. Goshorn prepared and submitted a child support obligation worksheet, which calculated Mrs. Goshorn's monthly child support obligation for the two minor children at $703.27. And that was the figure that the court ordered Mrs. Goshorn to pay in child support for the parties' two minor children, John and Zachary. The worksheet, it should be noted, reflected that Mrs. Goshorn's child support obligation of $703.27 included her share of $273 a month in work-related child care expenses.

## DISCUSSION

### I

■ Mr. Goshorn contends that the circuit court lacked jurisdiction to award Mrs. Goshorn indefinite alimony because it did not reserve Mrs. Goshorn's claim for alimony when it granted Mr. Goshorn's request for a judgment of absolute divorce. We disagree.

■ In Maryland, the circuit court has inherent power to reserve the issue of alimony when it enters a decree of divorce. *Turrisi v. Sanzaro*, 308 Md. 515, 526, 520 A.2d 1080 (1987). Reserving the right to award alimony enables the court to award alimony long after the divorce decree, when it

is appropriate to do so. *Id.* at 522, 520 A.2d 1080. But, "[i]f at the time of the divorce the court fails to either award alimony or reserve the right to award alimony at a later date, it is forever barred from ordering it." *Blaine v. Blaine,* 97 Md.App. 689, 701, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994); *see also Turrisi,* 308 Md. at 521–22, 520 A.2d 1080.

Here, the record reflects that the court reserved jurisdiction to award alimony after the entry of the divorce decree on August 17, 2001. The judgment for absolute divorce issued on August 17, 2001, specifically stated that *"all other issues* including child support, custody and marital property have been reserved and set for a future date before the Honorable Warren J. Krug in this Court." (Emphasis added). Those words were, to be sure, not intended to reserve only the three enumerated issues—child support, custody and marital property—for future consideration. Those three issues are only given as examples of "all" of the "other issues" that "have been reserved and set forth for a future date before the Honorable Warren J. Krug . . . ."

Mr. Goshorn nonetheless contends that an order reserving "all other issues" is insufficient to reserve jurisdiction to award alimony after a divorce. To bolster that claim, he cites *Speropulos v. Speropulos,* 97 Md.App. 613, 631 A.2d 514 (1993), which held that the circuit court's reservation of "all property issues," after granting a divorce, was insufficient to reserve jurisdiction to make a post-divorce award of alimony. *Id.* at 618, 631 A.2d 514. At the time the circuit court in *Speropulos* entered a judgment of divorce, it reserved jurisdiction over "all property issues including monetary award, if any . . . for future determination." *Id.* at 617, 631 A.2d 514. Noting that there is a distinction between alimony and the disposition of property, we concluded that "a reservation as to 'all property issues' is insufficient to retain jurisdiction over the issue of alimony." *Id.* at 618, 631 A.2d 514.

But, here, the circuit court did not limit its reservation to just "property issues." Rather, the court extended its reser-

vation to "all other issues," which presumably included Mrs. Goshorn's counterclaim for alimony. Indeed, this Court noted in *Speropulos* that had the circuit court utilized broad terminology, such as " 'this court shall have continuing jurisdiction in these proceedings,' " the court's order would have been sufficient to reserve jurisdiction to award alimony. *See id.* at 617–18, 631 A.2d 514 (quoting *Flood v. Flood,* 16 Md.App. 280, 286, 295 A.2d 784 (1972) (quoting *Reed v. Reed,* 11 Md.App. 396, 399, 274 A.2d 652 (1971))). The court's order in this case was therefore sufficiently broad to reserve jurisdiction on that issue.

Moreover, when the master stated at the August 16, 2001, divorce hearing that "[a]ll other matters, including child support, custody, marital property, have been reserved and set for (inaudible) before Warren Krug in this court (inaudible)," the following exchange occurred between Mrs. Goshorn's counsel and the domestic relations master:

[COUNSEL]: "All the issues would include alimony. At the last second, my client filed a counterclaim and I—," 
[MASTER]: "I see. We've included everything in the (inaudible)." 
[Counsel]: "I just want to make sure. I don't want anything (inaudible)." 
[MASTER]: "Oh, yes. Okay."

Although parts of this exchange are inaudible, the transcript clearly suggests that the parties addressed Ms. Goshorn's alimony claim, that the master was aware of that claim, and that the master intended to reserve it with all other issues for later review.

## II

Mr. Goshorn claims that, in applying the twelve factor alimony test of FL § 11–106(b), the circuit court "assumed and misapplied facts not in evidence." Specifically, he contends the court "erred on the evidence pertaining to factors 1,2,6,9, and 11" and that Mrs. Goshorn "failed to meet her burden of proof for either indefinite or rehabilitative alimony."

Neither of these claims can withstand scrutiny; but, because the trial court incorrectly calculated Mr. Goshorn's income, we shall vacate the circuit court's award of indefinite alimony and remand this case to that court to make whatever changes it may deem appropriate, if any, in light of this miscalculation.

A. *The Court's Findings With Respect to the Twelve Factor Alimony Test*

As noted, Mr. Goshorn contends the court "assumed and misapplied facts not in evidence" in applying the twelve factor alimony test of FL § 11–106(b). We begin our analysis of this claim by noting that it is not cast in the words of the applicable standard of review. The standard we must apply in evaluating this claim requires us "to accord great deference to the findings and judgments of [the] trial [court]," *see Tracey v. Tracey,* 328 Md. 380, 385, 614 A.2d 590 (1992), unless the circuit court's factual findings were clearly erroneous, Md. Rule 8–131(c), or its judgment was an "arbitrary use of discretion." *See Blaine,* 97 Md.App. at 698, 632 A.2d 191. Applying that standard, it appears that Mr. Goshorn's claims, at least as to some of the findings of fact made by the circuit court, have some merit.

FL § 11–106(b) provides that the court shall consider twelve factors in determining whether to make an alimony award. With respect to those factors, this Court has stated:

> In making an award of alimony, the trial court is required to consider all of the factors set forth in F.L. § 11–106(b). To be sure, the court "need not use formulaic language or articulate every reason for its decision with respect to each factor. Rather, the court must clearly indicate that it has considered all the factors." If the court fails to make clear that it has considered all of the factors, then the record, as a whole, must reveal that the court's findings were based on a review of the statutory factors.

*Digges v. Digges,* 126 Md.App. 361, 387, 730 A.2d 202 (1999) (quoting *Doser v. Doser,* 106 Md.App. 329, 356, 664 A.2d 453 (1995)) (citations omitted).

Trial court judges are vested "with a great deal of liberty to weigh the relevant factors and arrive at fair and appropriate results." *Blaine,* 97 Md.App. at 699, 632 A.2d 191. At bottom, the over-riding objective of the court is to do equity. *See Tracey,* 328 Md. at 393–94, 614 A.2d 590 ("Generally speaking, alimony awards, though authorized by statute, are founded upon notions of equity; equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests...." (citations omitted)).

The twelve factors are:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health–General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

FL § 11–106(b).

Although the court did dutifully consider all twelve factors, the court erred, Mr. Goshorn maintains, in applying factors one, two, six, nine, and eleven to the facts of this case. Factors one and two are so closely related that we shall consider them together.

1. *Factors One and Two—the Ability of the Party Seeking Alimony to be Wholly or Partly Self Supporting and the Time Necessary for the Party Seeking Alimony to Gain Sufficient Education or Training to Enable That Party to Find Suitable Employment*

■ In the words of the applicable standard of review—though not necessarily Mr. Goshorn's—Mr. Goshorn in essence contends that the court erroneously found that Mrs. Goshorn would never be wholly self-supporting and would never be able to obtain education and training necessary for suitable employment. We disagree.

At the time of the proceedings, Mrs. Goshorn earned less than $10 an hour,[5] and the trial essentially concluded that Mrs. Goshorn would never progress beyond her current status in

---

5. Parenthetically, we note that, according to a report prepared for the Center on Poverty Solutions, a Maryland non-profit organization, the "self-sufficiency wage" for a single adult in Calvert County is $10.21 an hour, or $1,798 a month. Diana Pierce, Ph.D. & Jennifer Brooks, *The Self–Sufficiency Standard for Maryland* 49 (2001) (prepared for the Advocates for Children and Youth and The Center for Poverty Solutions). Mrs. Goshorn's income is below the "self-sufficiency wage." As a single adult living in Calvert County, she is earning $9.36 an hour, or $1,622.40 a month.

the labor market. There is ample support for this finding in the record.

Mrs. Goshorn testified that, at age forty-two, she had been assessed as reading at a third grade level. Mr. Goshorn corroborated this testimony, stating that he was aware that Mrs. Goshorn had difficulty reading and was not surprised that she had been assessed at that level. Moreover, the record plainly shows that Mrs. Goshorn had more than a little difficulty in completing a basic financial statement. That and, the menial nature of most of her prior employment, led the court to conclude that Mrs Goshorn's "education and skills" place formidable limits on her ability to "find suitable employment." For these reasons, we cannot conclude that the court's finding was erroneous.

### 2. *Factor Six—The Circumstances Contributing to the Estrangement of the Parties*

Mr. Goshorn contends that the court erroneously concluded that the circumstances surrounding the estrangement of the parties was "a fairly neutral factor." Yet, we note that his brief does not present any facts supporting this claim. Moreover, there is sufficient evidence to support the court's finding. Testimony presented at the divorce hearing indicates only that the parties voluntarily separated. Accordingly, the court's finding that the estrangement was "a fairly neutral factor" is beyond cavil.

### 3. *Factor Nine—The ability of the Party from whom Alimony is Sought to Meet that Party's Needs While Meeting the Needs of the Party Seeking Alimony*

Mr. Goshorn claims that the court erred by concluding that Mr. Goshorn had the ability to meet his needs while meeting the needs of the Mrs. Goshorn. Once again, however, Mr. Goshorn's brief does not present any facts supporting a claim which he advances, while, as before, the record clearly contradicts his assertion.

That the record does not contain a financial statement prepared by Mr. Goshorn, nor testimony about his monthly expenses is a reflection of choices made by Mr. Goshorn and his counsel. There is, however, evidence of Mr. Goshorn's needs in the Joint Statement of Parties Concerning Marital Property and Non-marital Property. That statement, which was completed by Mr. Goshorn, asserts that there was a $63,000 outstanding mortgage on the marital home, and there were no liens on any of his automobiles. It therefore appears from the record that Mr. Goshorn's living expenses are modest.

On the other hand, Mr. Goshorn earned $69,992 a year, or $5,832.67 a month, in 2001. He also had about $36,000 in his thrift savings account. Given this evidence, the court's finding that Mr. Goshorn has the ability to meet his needs, while meeting Mrs. Goshorn's, was not clearly erroneous.

### 4. Factor Eleven—the Financial Needs and Financial Resources of Each Party

Mr. Goshorn also contends that the court's findings with respect to the parties' financial needs and resources were clearly erroneous. In part, we agree: the court did over-estimate Mr. Goshorn's financial resources.

The court estimated Mr. Goshorn's monthly income was "almost seven thousand dollars a month." This estimate is inconsistent with the evidence presented. Mr. Goshorn's income in 2001 was $69,992. Hence, Mr. Goshorn's actual monthly income was $5,832.67 a month, which is almost 20% lower than the court's estimate in its alimony award. We therefore conclude that the court's findings with respect to Mr. Goshorn's financial resources were erroneous and remand this matter to the circuit court to reconsider its alimony award in light of this error.

Furthermore, because we are vacating the court's alimony award on the grounds that it over-estimated Mr. Goshorn's income, we must also vacate the marital property award, because any significant change in alimony requires the court to reassess its monetary award. *C.f. Melrod v. Melrod,* 83

Md.App. 180, 195, 574 A.2d 1 (1990) ("[Vacating the monetary award] necessitates vacation of the alimony as well, since any significant change in the monetary award will require the court to reassess its alimony award.").

## B. The Court's Award of Indefinite Alimony

■ Mr. Goshorn contends Mrs. Goshorn failed to meet her burden of proof for indefinite alimony. He further maintains that the "[circuit] court did not find nor conclude the parties' standard of living was unconscionably disparate." We find no merit in either claim.

■ We begin our analysis by noting "the purpose of alimony is not to provide a lifetime pension." *Tracey*, 328 Md. at 391, 614 A.2d 590. Rather, alimony is designed "to provide the recipient spouse an opportunity to become self-supporting." *Id.* (quoting the Report of the Governor's Commission on Domestic Relations 2 (1980)). Nonetheless, "[i]n cases where it is either impractical for the dependent spouse to become self-supporting, or in cases where the dependent spouse will be self-supporting but still a gross inequity will exist, a court may award alimony for an indefinite period." *Roginsky v. Blake–Roginsky*, 129 Md.App. 132, 141, 740 A.2d 125 (1999). Maryland favors rehabilitative alimony over indefinite alimony, *Tracey*, 328 Md. at 391, 614 A.2d 590; therefore, indefinite alimony should be awarded only in exceptional circumstances. *See Turrisi*, 308 Md. at 525, 520 A.2d 1080. A court may award indefinite alimony if it finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

FL § 11–106(c).

■ Mr. Goshorn correctly asserts that Mrs. Goshorn, as the economically dependent spouse seeking indefinite alimony,

bears the burden of proving the need for indefinite alimony. *Crabill,* 119 Md.App. 249, 260–61, 704 A.2d 532 (1998); *Thomasian v. Thomasian,* 79 Md.App. 188, 195, 556 A.2d 675 (1989). That burden has been met.

As previously indicated, the record supports the circuit court's finding that Mrs. Goshorn has made all of the progress toward becoming self-supporting that can reasonably be expected. And, even then, as we have previously noted, she is barely self-supporting.[6]

The court also concluded that the parties' incomes were "truly disparate": even after imputing an additional ten hours of wages per week to Mrs. Goshorn's income, Mrs. Goshorn made only 27.8% of Mr. Goshorn's actual monthly salary.[7] This, to be sure, constitutes a gross disparity. We hasten to note, however, that "[a]lthough a significant mathematical disparity in income, present and future, is not necessarily a sufficient condition to justify an award of indefinite alimony, it is nonetheless a necessary condition." *Ware v. Ware,* 131 Md.App. 207, 229–30, 748 A.2d 1031 (2000). But mathematical disparity is only the starting point of an unconscionability analysis. The Court of Appeals has stated:

> While the mathematical comparison of the incomes of the parties is the starting point of the analysis, it is never conclusive. As the statute provides, the disparity must be "unconscionable," a determination which requires the application of equitable considerations on a case-by-case basis, consistent with the trial court's broad discretion in determining an appropriate award. As neither § 11–107 nor § 11–106(c) provides specific guidance with regard to making this determination, the court must look to the factors

---

6. *See supra* note 5.

7. In computing what percentage Mrs. Goshorn's monthly income was of Mr. Goshorn's monthly salary, we used the monthly figure he testified was his monthly income, $5,832.67, and not the erroneous figure used by the circuit court of $7,000. If we had used that figure, Mrs. Goshorn's monthly income would only have been 23.2% of Mr. Goshorn's.

under § 11–106(b), which provide guidance in determining an appropriate award.

*Blaine,* 336 Md. at 71–72, 646 A.2d 413; *see also Ware,* 131 Md.App. at 232–33, 748 A.2d 1031 ("[A] finding of a mathematical disparity will not automatically trigger an award of indefinite alimony and ... the trial judge must carefully consider all of the twelve factors spelled out by § 11–106(b) that are pertinent to a particular case."). Of course, "the greater the disparity, the more likely that it will be found unconscionable, all other factors remaining equal." *Roginsky,* 129 Md.App. at 147, 740 A.2d 125. And it is worth mentioning that Maryland's appellate courts have upheld indefinite alimony awards in cases with comparable, and even substantially smaller, disparities in the parties' incomes.[8]

In this case, the parties' disparity is consistent with, and in some instances greater than, other cases in which Maryland's appellate courts have upheld an award of indefinite alimony. *See id.* Furthermore, the court went beyond the mathematical disparity and adequately considered all of the relevant factors in FL § 11–106(b). We therefore cannot say that the court abused its discretion in awarding Mrs. Goshorn indefinite alimony.

Appellant contends, however, that the circuit court did not find the parties had an "unconscionable disparity" in their

---

**8.** In *Lee v. Lee,* 148 Md.App. 432, 448–49, 812 A.2d 1089 (2002), *cert. denied,* 374 Md. 83, 821 A.2d 371 (2003), this Court noted:

In ascending order, Maryland cases have found that the chancellor did not err in granting indefinite alimony to a spouse whose potential income, when compared to the non-dependent spouse's income, bore the following percentage relationship: (1) 22.7%—*Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994); (2) 25.3%—*Ware v. Ware,* 131 Md.App. 207, 230, 748 A.2d 1031 (2000); (3) 28%—*Tracey v. Tracey,* 328 Md. 380, 392–93, 614 A.2d 590 (1992); (4) 30%—*Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999); (5) 34%—*Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983); (6) 34.9%—*Broseus v. Broseus,* 82 Md.App. 183, 196–97, 570 A.2d 874 (1990); (7) 35%—*Bricker v. Bricker,* 78 Md.App. 570, 576–77, 554 A.2d 444, 449 (1989); and (8) 43%—*Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994 (1995).

standards of living when it awarded Mrs. Goshorn indefinite alimony. We disagree. Although the circuit court did not use the term "unconscionable," that is not fatal to the circuit court's award when it was at least implicit in its ruling. In *Tracey,* the circuit court did not use the term "unconscionable" in awarding indefinite alimony. *See* 328 Md. at 384, 614 A.2d 590. There, the trial judge concluded:

"The wife [is] working, and I don't think she can get any better job than she has now. She is not able to support herself; the husband is.

There was the question of rehabilitative alimony, and that's certainly out of the question. The wife has not done well in school. Even going back to pick up a couple of courses, they're not going to open up any doors to her.... [S]he is at a level, probably the best that's she [sic] going to obtain.

. . .

I think she is entitled to indefinite alimony because of her needs and the disparity between their relative incomes. 328 Md. at 384, 614 A.2d 590. On appeal, the Court of Appeals upheld the circuit court's decision to award indefinite alimony. *Id.* at 394, 614 A.2d 590.

Similarly, in this case, the circuit court did not use the term "unconscionable," but it nonetheless considered the equities of the case and decided, in light of these equities and the parties' "truly disparate" incomes, to award Mrs. Goshorn indefinite alimony.

Were it not for the circuit court's miscalculation of Mr. Goshorn's income, there would be more than adequate basis upon which to affirm the court's award of indefinite alimony. Because of that error, however, we are compelled to vacate that award and remand this issue to the circuit court for reconsideration.

### III

Mr. Goshorn contends that the circuit court erroneously calculated Mrs. Goshorn's child support obligation for two

reasons: (1) it failed to include support for Sarah, the parties' "destitute adult child," because it found her to be self-supporting; and (2) it failed to include daycare expenses in Mrs. Goshorn's child support obligation for all three children. We agree that the court erred in determining that Sarah was self-supporting, but we do not agree that the circuit court failed to include daycare expenses in Mrs. Goshorn's child support obligation for all three children.

## A. The Obligation to Support a Destitute Adult Child

In Maryland, it is a misdemeanor for a parent with sufficient means "to neglect or refuse to provide [a] destitute adult child with food, shelter, care, and clothing." FL § 13–102. A "destitute adult child" is "an adult child who: (1) has no means of subsistence; and (2) cannot be self-supporting, due to mental or physical infirmity." *Id.* § 13–101(b). In applying this standard, "[t]he child need not be penniless, nor may he be profligate. The duty of support arises when the child has insufficient resources and, because of mental or physical infirmity, insufficient income capacity to enable him to meet his *reasonable* living expenses." *Presley v. Presley*, 65 Md.App. 265, 277–78, 500 A.2d 322 (1985) (emphasis in original). And in making this determination, "[t]he court can examine the child's available assets, his eligibility for disability or other assistance, and his earning capacity and weigh them against what he reasonably needs to provide a proper subsistence level." *Id.* at 278, 500 A.2d 322.

Maryland's appellate courts have held that the legislature intended "to place failure to support an incapacitated child on equal footing with failure to support a minor child." *Smith v. Smith*, 227 Md. 355, 360, 176 A.2d 862 (1962); *see also Stern v. Stern*, 58 Md.App. 280, 295, 473 A.2d 56 (1984) ("Since the Court of Appeals has held that the legislature intended 'to place the failure to support an incapacitated child on equal footing with failure to support a minor child,' it follows that the procedure and remedies for the enforcement of that right must also be 'on equal footing.' " (quoting *Smith*, 227 Md. at 360, 176 A.2d 862)). Therefore, the duty to

support a "destitute adult child" is enforceable in equity, and the court may order support payments for a "destitute adult child." *See Smith*, 227 Md. at 360, 176 A.2d 862; *Presley*, 65 Md.App. at 275–76, 500 A.2d 322; *Stern*, 58 Md.App. at 295–96, 473 A.2d 56.

In this case, the parties agreed, and the court determined, that Sarah is a "destitute adult child" under FL § 13–101(b). Mr. Goshorn conceded that Sarah has the "mentality of a three or four year old," and that she has difficulty even attending to her personal hygiene. Yet, because Sarah temporarily receives SSI benefits, the circuit court concluded that although she was a "destitute adult child," she was "self-supportive." Specifically, the court stated:

> By consent of the parties, their oldest child, to wit: Sarah E. Goshorn, born July 28, 1983, is determined to be an adult child pursuant to [FL § 13–101(b)] but is currently receiving Social Security income benefits and is therefore considered self supportive and not considered in the order for the purpose of calculations of child support; . . . .

By concluding that Sarah was both a "destitute adult child" and "self-supportive," the circuit court erred. To designate Sarah as both is a contradiction in terms, or to use the word currently in vogue, an "oxymoron." Sarah cannot be both because a "destitute adult child" is by definition an adult child "who has no means of subsistence."

But, at stake here is more than a catachresis. By designating Sarah as self-supportive and then leaving that issue, the court skipped the first and necessary task of determining whether and how the child support guidelines should be applied to her and what support should be paid now and in the future if the SSI benefits end upon her twenty-first birthday.

 Once the court determined that Sarah was a "destitute adult child," its next step should have been to apply the child support guidelines in FL § 12–204 to determine the Goshorns' support obligation for Sarah. Although there are no reported cases addressing whether the child support guide-

lines apply to "destitute adult child[ren]," this Court held in *Stern* that because "the legislature intended 'to place the failure to support a [destitute adult child] on equal footing with failure to support a minor child,' it follows that the procedure and remedies for the enforcement of that right must also be 'on equal footing.' " 58 Md.App. at 295, 473 A.2d 56 (quoting *Smith*, 227 Md. at 360, 176 A.2d 862). We therefore instruct the circuit court that the child support guidelines are applicable to destitute adult children as they are to minor children.

The next question is whether Sarah's SSI benefits should then have any effect on the Goshorns' obligation under the child support guidelines. To answer that question, we begin by noting that "[t]here is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines set forth in this subtitle is the correct amount of child support to be awarded." FL § 12–202(a)(2)(i) (2003 Cum.Supp.). That presumption is not indulged in all situations. In fact, the court may deviate from the guidelines if their application would be "unjust or inappropriate." *Id.* § (a)(2)(ii). But, in making such a determination, the court "shall make a written finding or specific finding on the record stating the reasons for departing from the guidelines." *Id.* § (a)(2)(v). The finding shall state: "[T]he amount of child support that would have been required under the guidelines; how the order varies from the guidelines; and how the finding serves the best interests of the child; . . ." *Id.; see also Drummond v. State,* 350 Md. 502, 517, 714 A.2d 163 (1998). That did not occur here. The court simply declared Sarah "self-supportive" without applying the child support guidelines and then considering how the SSI benefits should affect that obligation. Simply because an adult child receives SSI benefits does not necessarily render that child self supporting.

For example, in *Stern,* 58 Md.App. 280, 473 A.2d 56, the circuit court awarded child support for a "destitute adult

child," [9] who was a nineteen year old, living on his own, and receiving SSI benefits. *Id.* at 289, 294, 473 A.2d 56. We affirmed, noting that because of his major medical problems, his family had to provide "the bulk of his support." *Id.* at 294, 473 A.2d 56. In ordering support, the circuit court found, and we agreed, that he was a "destitute adult child." *Id.* at 295, 473 A.2d 56.

It is important to note, however, that the child support guidelines do not provide for the automatic application of Social Security benefits directly against the obligor's support obligation. *Drummond,* 350 Md. at 516, 714 A.2d 163; *Ley v. Forman,* 144 Md.App. 658, 674, 800 A.2d 1 (2002); *Anderson v. Anderson,* 117 Md.App. 474, 483, 700 A.2d 844 (1997), *vacated on other grounds,* 349 Md. 294, 708 A.2d 296 (1998). Indeed, the benefits are by no means an automatic credit or necessarily a dollar for dollar set off against a child support obligation. *See Drummond,* 350 Md. at 519, 714 A.2d 163; *Ley,* 144 Md.App. at 674, 800 A.2d 1; *Anderson,* 117 Md.App. at 482–83, 700 A.2d 844.

In *Ley,* this Court stated that the policy behind this rule is that "[relieving] a parent of his or her obligation because the child receives a benefit to which he or she is entitled from some other source would not ordinarily be consistent with [the parent's duty to provide for the maintenance of their children.]" 144 Md.App. at 671, 800 A.2d 1. Furthermore, "[t]his approach puts a child of separated parents in the same situation as a child of parents because it allows the child to maintain the same standard of living as if the parents had not separated." *Ley,* 144 Md.App. at 672, 800 A.2d 1 (quoting *Drummond,* 350 Md. at 521, 714 A.2d 163). The same reasoning would apply to a "destitute adult child." We are therefore remanding this case to the circuit court to reconsider Mrs.

---

9. This finding was based on former Art. 27 § 97. *See id.* at 293–94. But as this Court noted in *Presley,* FL § 13–101(b) is derived from this former statute without substantive change. 65 Md.App. at 277, 500 A.2d 322.

Goshorn's child support obligations, to apply the child support guidelines, and to make required findings.

## B. Child Care Expenses

Finally, Mr. Goshorn contends that the court erroneously calculated Mrs. Goshorn's child support obligation by failing to include daycare expenses for the children. This is incorrect. The court added Mrs. Goshorn's income share of $273 in child care expenses to her basic child support obligation.

FL § 12–204(g)(1) provides that "actual child care expenses incurred on behalf of a child due to employment or job search of either parent shall be added to the basic obligation and shall be divided between the parents in proportion to their incomes." Furthermore, "[c]hild care expenses shall be determined by actual family experience, unless the court determines that the actual family experience is not in the best interest of the child" *Id.* § (g)(2)(i).

Mrs. Goshorn's basic support obligation, without adding child care, was $586 a month.[10] *See* FL §§ 12–204(e), 12–204(k). But, the court, without explanation, ordered Mrs. Goshorn to pay Mr. Goshorn $703.27 per month for support of the minor children. This amount includes Mrs. Goshorn's income share, 42.7%[11] of the parties joint income, of $273 in monthly child care expenses.

## CONCLUSION

We hold that the circuit court retained jurisdiction over the issue of alimony after it granted Mr. Goshorn a judgment for absolute divorce. We shall vacate the award of indefinite alimony because of error made by the court in calculating Mr. Goshorn's income. Because we are vacating the award of indefinite alimony, we are required to vacate the court's monetary award because any significant change in alimony

---

10. This figure excludes support for Sarah.

11. This percentage includes Mrs. Goshorn's alimony award.

will necessitate a reassessment of Mrs. Goshorn's marital property award.

Furthermore, we shall vacate the circuit court's child support award and remand this matter to that court to apply the child support guidelines in FL § 12–204 to the support of all three children. The court may consider Sarah's SSI benefits as grounds for departing from the guidelines, but only if it finds applying the guidelines would be "unjust or inappropriate" and makes the findings that a departure would be in Sarah's best interests. We further instruct the circuit court to determine what means of support Sarah will have after she reaches the age of twenty-one and, in the event that the SSI benefits do end at twenty-one or are reduced, to make an award of child support it deems would be in her best interests. Finally, we hold that the circuit court properly included Mrs. Goshorn's share of the parties' child care expenses in determining Mrs. Goshorn's child support obligation.

**JUDGMENT VACATED IN PART AND AFFIRMED IN PART.**

**CASE REMANDED TO THE CIRCUIT COURT FOR CALVERT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.**